ALLAN S. VINNELL AND PAULINE VINNELL, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1497–66.   Filed September 11, 1969.

*Max Thelen, Jr.*, and *David M. Bridges*, for the petitioners.
*Charles W. Nyquist*, for the respondent.

**OPINION**

The sale of the CVM stock by petitioner to Vinnell Corp. falls within the purview of section 304(a)(1),[2] and the parties so agree. That section requires that property received by petitioner in return for the CVM stock be treated as a distribution in redemption of the stock of the acquiring corporation (Vinnell Corp.). For the purposes of the present case, the term "property" is defined by section 317 as money, securities, or other property.

We are thus required to treat this sale of stock as a redemption by petitioner of his stock in Vinnell Corp. Section 302(a)[3] requires us to treat the redemption as a distribution in exchange for the stock so long as the transaction meets one of the four tests of section 302(b). Petitioner contends that he meets the test of section 302(b)(1)[4] in that the redemption was not essentially equivalent to a dividend. On the other hand, respondent contends that the redemption fails to meet the test, and that therefore section 302(a) cannot apply. Instead, respondent contends that section 302(d)[5] requires us to treat the redemption as

---

[2] SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.

  (a) TREATMENT OF CERTAIN STOCK PURCHASES.—

    (1) ACQUISITION BY RELATED CORPORATION (OTHER THAN SUBSIDIARY).—For purposes of sections 302 and 303, if—

      (A) one or more persons are in control of each of two corporations, and

      (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,

then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

[3] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

  (a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

[4] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

  (b) REDEMPTIONS TREATED AS EXCHANGES.—

    (1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

[5] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

  (d) REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

a distribution of property to which section 301 applies. The issue as presented by the parties and submitted for decision therefore deals with whether the redemption was essentially equivalent to a dividend. Sec. 302(b)(1). Respondent contends that it was, and so the 1961 installment payment should be treated as a distribution taxable as ordinary income. Petitioner argues that it was not essentially equivalent to a dividend, and asks us to preserve capital gains treatment for the 1961 installment payment.

Essentially, petitioners contend that the sale of the CVM stock to Vinnell Corp. was born of business necessity, and therefore cannot be essentially equivalent to a dividend. They have argued that business purposes made it necessary to contract the various entities which comprised petitioner's construction empire into one operating corporation so as to increase the business "quick assets," thereby improving its credit position and bonding capacity. They aver that another purpose of the sale was to make the offer to sell stock in Vinnell Corp. more attractive to its key executives, "to the end that the prosperity, further expansion and perpetuity of the business could be assured." Thus petitioner contends that the sale of CVM to Vinnell Corp. was designed to go hand-in-hand with the idea of permitting the key executives to acquire an equity interest in the business and was a part of the planned recapitalization.

Section 304(a)(1) was enacted in order to prevent a taxpayer from using brother-sister corporations which he controls as an instrumentality for "bailing out" corporate earnings at capital gains rates. It requires the transaction to be viewed through the section 302 glass with its accompanying safeguards against dividend equivalency, rather than as a sale of stock to an unrelated third party. We therefore will examine each of the motives for the sale put forth by petitioners with a view towards discerning whether a bailout of corporate earnings, such as would give rise to the dividend equivalence result, was being attempted.

Petitioners first contend that the combining of Vinnell Corp. and CVM increased the "quick assets" which improved the acquiring corporation's credit position and bonding capacity. This argument finds little support in the record. During the years while petitioner owned both CVM and Vinnell Corp., CVM had no direct banking relations as such, but rather its finances were handled as if it were a part of Vinnell Corp. Before the sale, CVM's spare cash was combined with the operating funds of Vinnell Corp. to provide additional operating funds for the entire group. As reflected in our findings, at the time of sale CVM had only $5,000 in cash on hand and held over $500,000 in notes receivable and $179,000 in accounts receivable of Vinnell Corp. It also held $340,000 in accounts receivable of LVA.

When these notes or accounts were due does not appear of record. We conclude that contrary to petitioners' contentions, CVM had almost no quick assets even though it might be regarded from the accounting point of view that some working capital as such was brought into the Vinnell picture by the stock transfer. However, all the corporate loans and bonds had always been personally guaranteed by petitioners, so that in effect petitioner's stock in CVM stood back of all Vinnell Corp.'s obligations as assets of the guarantor. No additional security therefore actually resulted from the transfer of the CVM stock to Vinnell Corp.

There was no evidence offered that the Bank of America demanded or requested the purchase of petitioner's CVM stock, it being merely stated by Vinnell himself on the witness stand that the stock "was to be sold or included in the reorganization" and that the sale transaction was set up and arranged because of the decision of his financial and legal advisers. The evidence of record does not convince us that the motivating force for the sale arose from corporate business purposes to obtain credit or to improve bonding arrangements; we conclude that Vinnell Corp.'s credit position and bonding capacity were not materially aided by the sale. Petitioners continued to guarantee corporate borrowings and obligations after the sale up to time of trial as they had always done. Thus while the acquisition of the CVM stock might have resulted in the improvement of Vinnell Corp.'s financial position to some extent, it cannot be regarded as the reason for the purchase.

If Vinnell Corp. was concerned about its credit situation and its capacity to obtain performance bonds, why did it pay out $150,000 in cash and obligate itself to pay an additional $1,350,000 over a 9-year period? A further issuance of stock, common or preferred, in lieu of such an obligation would have obviously been a more satisfactory device to enhance its financial attractiveness to banks and bonding companies. *Kerr* v. *Commissioner*, 326 F. 2d 225, 232 (C.A. 9, 1964), affirming 38 T.C. 723 (1962), certiorari denied 377 U.S. 963 (1964).

The next contention as to corporate business purpose put forth by petitioners appears to be similarly unsupported by the facts of record. It is argued that petitioner had intended for years to combine CVM with Vinnell Corp. as a part of the recapitalization and sale of stock to key employees. Petitioner discussed the sale of stock to certain key employees at the time of their employment and thereafter, with the understanding that petitioner would allow them to acquire an equity interest in Vinnell Corp. when conditions permitted. No mention was made at the time such discussions were held of making CVM a subsidiary of Vinnell Corp. or of a sale by petitioner of his stock. Petitioner has alleged that the sale of the CVM stock was an integral part of

the recapitalization under which petitioners received different stock and key employees acquired stock interests, yet no mention was made of the CVM sale either to the affected employees, to the State of California in the application to recapitalize, in the plan for recapitalization submitted to the Internal Revenue Service on September 21, 1959, or in the stockholders' agreement attached thereto.

In light of the lack of evidence indicating that the sale was a part of the recapitalization, we are inclined to agree with respondent that it was an afterthought by petitioner rather than a part of his long-range plans. Although petitioner stressed at trial that he had always wanted to bring CVM into Vinnell Corp., he did not know why a sale of his CVM stock was necessary to accomplish that objective.

We conclude that the initiative for the sale originated, at a late date in 1959, with petitioner who was advised by his financial and legal advisers that the transaction, which had not theretofore been contemplated as a part of the recapitalization or plan to permit key employees to become stockholders, be cast as a purchase and sale. As the sole stockholder of CVM and as owner of 55 percent of Vinnell Corp.'s stock and with his wife (who owned the other 45 percent of that stock), the owner of 100 percent of Vinnell Corp. also,[6] it would strain credibility to believe that initiative to obligate itself to pay petitioner $1,500,000 came from the corporation and not from petitioner. *Kerr* v. *Commissioner, supra.*

Applying the constructive-ownership rules of section 318(a)(2) (C),[7] there was no change in the stock ownership caused by the sale of CVM to Vinnell Corp. Although subsequently petitioner's constructive ownership of Vinnell Corp., and thus CVM as well, was reduced from 100 percent to 79 percent in June of 1960 when the key employees acquired their stock interests, we have found that the CVM sale was not a part of the recapitalization and sale thereafter of some common stock to employees. Therefore, the distribution in redemption, by itself, did not result in any change in the proportionate ownership of stock by the shareholders.

The parties have stipulated that Vinnell Corp. had never paid a dividend. There are no other corporate distributions with which we may compare the one in question in order to find that it was anything but an attempted bailout of corporate earnings at capital gains rates.

We have already discussed petitioner's allegations regarding a business purpose for the CVM sale above, and found them to be without

---

[6] Secs. 302(c)(1) and 318(a)(1)(A)(i), I.R.C. 1954.

[7] SEC. 318(a)(2)(C). FROM CORPORATIONS.—If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such person shall be considered as owning the stock owned, directly or indirectly, by or for such corporation, in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation.

support in the record. Even if we were to give credence to petitioner's "business purpose" argument that the CVM sale took petitioner out of competition with Vinnell Corp. and was part of the long-range recapitalization plan, thereby making the Vinnell Corp. stock more attractive to the key employees, it has been held many times that the existence of a single business purpose will not of itself conclusively prevent a determination of dividend equivalence. *Kerr* v. *Commissioner*, *supra; United States* v. *Fewell*, 255 F. 2d 496 (C.A. 5, 1958); *Bradbury* v. *Commissioner*, 298 F. 2d 111 (C.A. 1, 1962), affirming a Memorandum Opinion of this Court; *Kessner* v. *Commissioner*, 248 F. 2d 943 (C.A. 3, 1957), affirming per curiam 26 T.C. 1046 (1956); *Genevra Heman*, 32 T.C. 479 (1959); and *Neff* v. *United States*, 305 F. 2d 455 (Ct. Cl. 1962).

We conclude and hold that here there was no real or meaningful shift in the position of the petitioner, qua stockholder, in relation to the corporation and the other shareholders occasioned by the distribution. Immediately thereafter petitioner owned precisely the same stock interest and yet he had received $150,000 and would receive $1,350,000 more by virtue of the sale agreement. Inasmuch as the distribution was initiated by the petitioner for a stockholder purpose, not a corporate business purpose, and in light of the dividend history, we are of the opinion that it was essentially equivalent to a dividend. We so hold.

After the case was submitted and the parties had filed their briefs, it occurred to us that there was a further issue, not discussed by the parties or presented on brief. This was whether or not the contractual obligation of the 1959 contract itself might not properly be regarded as the distribution of property in that year so that if dividend equivalence were determined, the taxable event took place at that time. In *Kerr* v. *Commissioner*, *supra*, involving issues similar to those presented here, the issuance of a promissory note by the acquiring corporation was held to be essentially equivalent to a dividend in the face amount of the note in the year of issuance even though it was by express terms payable in equal yearly installments thereafter over a period of 5 years. It is clearly contemplated and suggested by section 312(a) (2), by the regulations,[8] and by leading tax treatises[9] that *in lieu of distributing cash or property*, a corporation may distribute its own obligations with the identical tax consequences.

The petitioner declined to take a position on this issue or to file a supplemental brief, but respondent filed a brief. He suggested that

---

[8] Secs. 1.301–1(d) and 1.301(h)(2)(i), Income Tax Regs.

[9] Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, sec. 5.40 (2d ed. 1966).

assuming *arguendo* that the distribution here involved was essentially, equivalent to a dividend, there were here a series of distributions pursuant to the acquiring corporation's contractual obligation to petitioner, which was not itself a distribution of money or property within the meaning of section 301(b)(1)(A) in the year of execution, 1959; the payments themselves in the various years, including 1961, constituted dividends at the times they were made.

We agree with respondent and on the record before us conclude and hold that the contractual obligation here involved did not constitute the distribution of an obligation of the acquiring corporation in 1959 so as to subject it to taxation as a money or property distribution in that year. The contract itself was merely written evidence of the obligation of Vinnell Corp. to pay petitioner $1,500,000 over a period of years for his stock of Cia. Vinnell and not intended by the parties to be in payment of that obligation. The contract contained no provision for the payment of interest. The petitioner's rights to payments were subject to various contingencies; they were subject to deferral beyond the 10-year term specified because of prohibitions in any loan agreements with lending institutions or "any similar prohibition." Furthermore, petitioners specifically agreed that his rights to payments under the contract "shall be subordinate to any claims of the Bank of America" arising under or out of its present lending agreement with Vinnell Corp. and he further agreed to execute any subordination agreement which the bank might require.

Under all of the facts and circumstances here present, the contractual obligation created in 1959 cannot properly be regarded as a distribution in that year of money or property within the meaning of section 301(b)(1)(A). Cf. *Nina J. Ennis,* 17 T.C. 465 (1951); *Dudley T. Humphrey,* 32 B.T.A. 280 (1935).

We agree with respondent that the annual payments made by Vinnell Corp. to petitioner under its contract of December 31, 1959, were a series of distributions within the purview of sections 301 and 316 in the years in which they were made. In view of the fact that Vinnell Corp., the acquiring corporation, had accumulated earned surplus of $878,323.35 as of December 31, 1961, and petitioners have not established that accumulated earnings and profits did not equal at least the amount determined by respondent as a taxable dividend, the 1961 payment of $150,000, here involved, is taxable to petitioners as ordinary income. The respondent's determination must be sustained.

*Decision will be entered for the respondent.*