*RAY A. MAHER AND ROSE M. MAHER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

*RAY A. MAHER, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2916–67, 4667–69, 4668–69. Filed December 10, 1970.

*Supplemental Opinion appears at 56 T.C.—(July 12, 1971).

*John J. Alder* and *A. Henry Cuneo*, for the petitioners.
*Larry K. Hercules*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioners' Federal income tax as follows:

| Docket No. | Petitioner | Year | Amount |
|---|---|---|---|
| 2916-67 | Ray A. Maher and Rose M. Maher | 1963 | $184,073.30 |
| 4667-69 | Ray A. Maher and Rose M. Maher | 1965 | 13,861.68 |
| | | 1966 | 13,192.56 |
| | | 1967 | 125,315.57 |
| 4668-69 | Ray A. Maher, Transferee | 1964 | 25,155.22 |
| | | 1965 | 6,000.00 |
| | | 1966 | 5,400.00 |
| | | 1/1/67—7/31/67 | 4,800.00 |

Concessions having been made, the remaining issues for our decision are as follows:

(1) Whether Selectivend Corp.'s assumption of payments on Ray A. Maher's personal promissory notes in 1963 constituted income to him in that year to the extent of the earnings and profits of Selectivend either because said assumption was a distribution of property taxable as a constructive dividend under section 301[1] or because it was "other property" received in redemption of stock of Selectivend's sister corporation under section 304, which redemption was essentially equivalent to a dividend under section 302 and therefore taxable under section 301 (docket No. 2916-67), or alternatively;

(2) Whether Selectivend Corp.'s payments of Ray A. Maher's promissory notes constituted income to him in 1965, 1966, and 1967, under either of the above two theories (docket No. 4667-69);

(3) Whether the Selectivend Corp. is entitled to deductions for interest payments it made during 1965, 1966, and 1967, on Ray A. Maher's personal promissory notes (docket No. 4668-69);

(4) Whether the statute of limitations precludes respondent from assessing transferee liability against petitioner Ray A. Maher for any deficiencies in income taxes determined to be due from the Selectivend Corp. for its taxable years ended December 31, 1964, and December 31, 1965 (docket No. 4668-69).

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations and exhibits attached thereto are incorporated herein by this reference.

Petitioners herein are Ray A. Maher (hereinafter sometimes referred to as Ray or petitioner with regard to docket No. 4668-69) and his wife, Rose M. Maher, who both resided in Kansas City, Mo.,

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise stated.

at the time the petitions in these consolidated cases were filed. Their joint Federal income tax returns for the years in issue were filed with the district director of internal revenue, Midwest regions.

On April 26, 1963, Ray entered into an agreement with Nova M. Johnson (hereinafter sometimes referred to as Nova), J. D. Bowersock (hereinafter sometimes referred to as Bowersock), Harry A. Hall (hereinafter sometimes referred to as Harry), and the Estate of Fred F. Johnson (hereinafter sometimes referred to as estate), for the purchase of all the stock of the Selectivend Corp. (hereinafter sometimes referred to as Selectivend), the Surevend Co. (hereinafter sometimes referred to as Surevend), the Selvend Co. (hereinafter sometimes referred to as Selvend), and the Selvex Corp. (hereinafter sometimes referred to as Selvex).

For several years prior to and during the years in issue, the four corporations involved in the sale had their home offices at the same business address and were operated by essentially the same officers. Selvex manufactured soft drink vending machines which it sold to Surevend and Selvend. The latter two corporations, functioning as sales organizations, sold the machines to various bottling companies, such as 7-Up, Pepsi-Cola, etc. The management functions for these three corporations were performed by Selectivend which determined, for example, what products were produced by Selvex; the prices Selvex would charge for products it sold to Surevend and Selvend and the prices the latter two corporations would charge to their customers.

At the time of the agreement, Selectivend, Surevend, and Selvend were each owned 50 percent by Nova, as sole beneficiary of the estate and 50 percent by J. D. Bowersock. Selvex was owned 50 percent by Harry and 50 percent by Nova, as sole beneficiary of the estate.

The following letter states the terms of the agreement between Ray and the sellers, as well as the conditions of an escrow arrangement entered into among the parties:

APRIL 26, 1963

UNION NATIONAL BANK
*Kansas City, Missouri*

Attention Mr. Ralph Warner

DEAR MR. WARNER:

The Executors of the Estate of Fred F. Johnson, Nova M. Johnson, J. D. Bowersock, and Harry A. Hall, individually have agreed to sell all the outstanding stock in the following companies, to wit:

|  | Shares authorized | Owned by company | Owned by sellers |
|---|---|---|---|
| The Selectivend Corp | 200 | 20 | 180 |
| Surevend | 100 | 100 | 100 |
| Selvend | 50 | | 50 |
| Selvex | 100 | 52 | 48 [1] 100 |

1 The significance of this figure is not known.

to Ray A. Maher for the total sum of $500,000.00 upon the following terms and conditions, said sum to be allocated among the Sellers as follows: Nova M. Johnson, widow of Fred F. Johnson, $125,000.00 cash, $125,000.00 installment note; J. D. Bowersock, $125,000.00 cash; Harry A. Hall, $125,000.00 installment note.

(1) The Sellers shall deliver all of said stock certificates duly endorsed in blank to the Union National Bank on or before May 3, 1963, which stock shall be held by the Bank as collateral security for the payment of said installment notes and the performance of this agreement as herein provided.

(2) The Buyer shall deposit $125,000.00 with said Bank on or before May 3, 1963, and an additional $125,000.00 less credits, if any, for properties transferred to any of the Sellers on or before June 3, 1963. The balance of $250,000.00 shall be represented by promissory notes of the Buyer payable in installments on or before ten years from this date with interest at 5% per annum.

(3) The Buyer shall secure the release of the Sellers (and their collateral security) from their endorsement and guaranty of bank loans to or for The Selectivend Corporation and the Selvex Company in the principal amounts as follows:

| | |
|---|---|
| Union National Bank | $255,000.00 |
| Kansas City Trust Company | 100,000.00 |
| Columbia National Bank | 35,000.00 |

(4) The Buyer shall satisfy the Sellers of his ability to provide immediate working capital for the company of not less than $100,000.00.

(5) The Buyer shall employ competent and qualified management for the companies satisfactory to the Sellers or the holder (or holders) of said promissory notes until said notes are paid in full.

(6) The Sellers agree that they will indemnify and hold harmless the Buyer against

a) Federal and State income tax or other tax liabilities not now shown on the books of the companies and which may be assessed against the corporations to be purchased, for the years 1961 to date.

b) Liability on any judgment or settlement resulting from litigation now pending between the Selectivend Companies and the Vendo Company, provided that (1) the sellers shall be entitled to receive the sum of any cash settlement which might be received in that litigation less costs and attorneys' fees; (2) any settlement shall be approved by Judge Hall; (3) liability under this indemnity shall be separate as to each seller in proportion to the amount received by them and shall not exceed the total amount so received.

(7) The Sellers agree to call special meetings of the stockholders and directors of said companies and to resign as officers and directors, and the Buyer may elect such officers and directors as he desires.

(8) The Bank shall hold said corporate stocks for the use and benefit of the Buyer provided he is not in default of any of the terms or conditions of this agreement; and shall vote said stock as directed by the Buyer.

In the event the Buyer shall default in any of the terms or conditions of this agreement, he shall be given 30 days to rectify such default after notice from the Bank or any holder of said promissory notes, and upon failure to cure such default by the Buyer or his heirs, representatives, or assigns, the Bank shall vote said stock as directed by such holder until said default is corrected or said promissory notes are paid in full.

(9) After completion by the Sellers of the requirements of paragraphs numbered (1), (6) and (7), the Bank shall deliver the purchase money and notes deposited by the Buyer to the Sellers.

(10) This escrow agreement shall be binding on the representatives, heirs and assigns of the parties hereto.

(11) All escrow expenses shall be paid one-half by the Sellers and one-half by the Buyer, except that any expense caused by the breach of this agreement shall be paid by the party causing such breach.

IN WITNESS WHEREOF the parties have executed this agreement the day and year aforesaid.

(S) Ray A. Maher
RAY A. MAHER

            (S) NOVA M. JOHNSON
            (S) HARRY A. HALL
            *Co-Executors of Estate of Fred F. Johnson*
            (S) Nova M. Johnson
            HARRY A. HALL

Accepted June 3, 1963
UNION NATIONAL BANK, *Kansas City, Mo.*

            (S) J. D. Bowersock
            J. D. BOWERSOCK
            (S) Harry A. Hall
            NOVA M. JOHNSON

(S) [Illegible]
    *President*

Promissory notes dated July 3, 1963, were made out to Nova and Harry and called for payments to each of $12,500 per annum for 8 years and a final payment of $25,000. The first payments to both were due on June 1, 1965, and subsequent payments were due on the same month and day in the succeeding years. Interest was at 5 percent per annum.

The stock certificates of the four corporations were endorsed in blank and deposited with the Union National Bank of Kansas City, Mo., as collateral security for the payment of the above installment notes. As indicated by the above letter, the bank was to vote the stock as directed by the buyer unless he was in default in any of the terms or conditions of the contract; however, in case of default, the bank was instructed to vote the stock as directed by the noteholders. The purpose of this arrangement was to facilitate the immediate reacquisition of the companies by the sellers in case of default, thereby avoiding the time consuming process of suing for performance.

At various times after April 26, 1963, the officers of Selectivend informed Ray that they wanted to combine the assets and operations of Selvex with Selectivend. Such a combination could not have been effected prior thereto because Harry, who owned 50 percent of Selvex's stock and no stock in the other three concerns except qualifying shares, had consistently opposed the combination.

As part of a plan to accomplish the desired result, Ray assigned his interest in the contract to Selectivend in exchange for assumption of

his liability on the promissory notes. Harry, representing the sellers, did not object to this so long as: (1) Ray continued to be liable on the notes should Selectivend not pay; (2) the stock certificates continued in escrow with the Union National Bank until the notes were paid in full; and (3) no dividends, except stock dividends, be paid until all conditions of the purchase agreement were fully met. The assignment was recorded on Selectivend's books by showing an amount of $250,000 on the asset side of the balance sheet offset by an item of $250,000 on the liability side under notes payable.

The said assignment, dated December 31, 1963, reads as follows:

#### ASSIGNMENT OF CONTRACT FOR PURCHASE OF STOCK

This contract made this 31st day of December 1963, between The Selectivend Corporation, Inc., party of the first part, and Ray A. Maher, party of the second part, witnesseth as follows:

WHEREAS party of the first part is desirous of acquiring the capital stock of Selvex Corporation, Inc., for the purpose of acquiring all the assets of that corporation; and

WHEREAS party of the second part has contracted to buy the capital stock of Selvex Corporation, Inc., in a contract dated April 26, 1963, under the terms of which he also contracted to buy the capital stock of companion corporations designated The Selectivend Corporation, Surevend Company, and Selvend Company; and

WHEREAS the capital stock of all those corporations has been placed in escrow with the Union National Bank of Kansas City, Missouri, until such time as all the conditions of the aforementioned contract have been met;

Now THEREFORE in consideration of the sum of $1.00, which is hereby acknowledged as received, party of the first part agrees to assume all the obligations of party of the second part under the terms of the contract of April 26, 1963, for the purchase of the capital stock of Selvex Corporation, Inc., and specifically to assume the obligation to pay the two promissory installment notes, one payable to Nova M. Johnson and one to Harry A. Hall, each in the amount of $125,000, dated June 3, 1963, and bearing interest at five percent per annum payable annually, and each payable $12,500 a year over a ten-year period commencing June 1, 1965, and ending June 1, 1973, except that the last payment shall be for $25,000; and party of the second part assigns and transfers all his right, title, and interest under the aforementioned contract of April 26, 1963, to party of the first part, except, however, that party of the second part shall still be liable under the contract of April 26, 1963, and specifically on the notes dated June 3, 1963, should party of the first part fail to meet their terms and conditions.

In witness whereof the parties have duly executed this agreement.

Attest:
(S) Richard H. Schies, *Secretary*
RICHARD H. SCHIES, *Secretary*

THE SELECTIVEND CORPORATION
*By* [Illegible]
*Party of the First Part*
(S) Ray A. Maher
RAY A. MAHER
*Party of the Second Part*

As a further step in combining the assets of the two corporations, Selvex was dissolved on March 31, 1964, and its assets and liabilities were taken over by Selectivend. Harry, representing the sellers, agreed to the dissolution because he felt that the sellers would have the same assets as security after dissolution as before. He still insisted, however, that Ray continue to be liable under the terms of the original contract and that the stock certificates of Selvex remain unchanged with the escrow agent in spite of dissolution. Surevend and Selvend were subsequently liquidated on June 30, 1965. Selectivend itself officially dissolved on October 16, 1967, transferring its assets to Ray.

Prior to dissolution, Selectivend made the following payments of principal and interest to Nova and Harry under the assignment agreement between itself and Ray:

| Year | Principal | Interest |
|---|---|---|
| 1965 | $25,000 | $12,500 |
| 1966 | 25,000 | 11,250 |
| 1967 | 200,000 | 10,000 |

It deducted the interest on its corporate income tax returns for the appropriate years. After the final payment all stock was released from the escrow.

Selectivend's earned surplus for the years 1963 through 1966 and in the short year 1967 were shown on its tax returns as follows:

| Year | Earned surplus |
|---|---|
| 1963 | $232,485.99 |
| 1964 | 440,901.85 |
| 1965 | 656,514.58 |
| 1966 | 848,949.30 |
| 1967 (until July 31) | 202,019.81 |

Ray timely signed Forms 2045 as a transferee, assuming and agreeing to pay all income taxes owed by Selectivend for the taxable years ended December 31, 1964, and December 31, 1965, respectively; and thereafter he signed Forms 977, extending the period of time for assessment against him as a transferee for unpaid taxes owed by Selectivend for the years ending December 31, 1964, and December 31, 1965, respectively. The agreement extending the deadline for the year ending December 31, 1964, reads as follows:

Pursuant to existing Internal Revenue Laws Ray A. Maher, a transferee of 910 Pennsylvania Avenue, Apt. 609, Kansas City, Missouri 64105, and the
(City)      (State)
xxxxxxx (or Assistant Regional Commissioner-Appellate) hereby consent and agree as follows:

That the amount of the liability, at law or in equity, of Ray A. Maher as transferee, in respect of any income, gift, or profits taxes (including interest, additional amounts, and additions to the tax provided by law) imposed against or due from The Selectivend Corporation, for the taxable year (xxxxxxx) ended

December 31, 1964, under existing or prior revenue acts, may be assessed at any time on or before December 31, 1969, except that if a notice of such liability is sent to said transferee by certified or registered mail on or before that date, the time for making any assessment as aforesaid shall be extended beyond that date by the number of days during which the making of an assessment is prohibited and for sixty days thereafter.

In docket No. 2916–67, respondent issued his statutory notice on March 24, 1967, and determined that the assumption of liability by Selectivend resulted in a taxable dividend to petitioners. In explanation, he stated:

(a) It is determined that you realized income taxable as a dividend from the assumption of your liability by the Selectivend Corporation of Kansas City, Kansas, in the amount of $250,000.00 to the extent of $232,485.99, the amount of the earned surplus of the Selectivend Corporation of Kansas City, Kansas. Since you failed to include any portion of such amount in your return filed for the taxable year ended December 31, 1963, your taxable income is increased $232,485.99.

In docket No. 4667–69, respondent issued his statutory notice of deficiency on August 11, 1969, and determined that in the years of payment of the promissory notes and the interest thereon, dividend income was received by petitioners in the amount of the payments and interest. At the same time he conceded that the amounts of interest payments were deductible by petitioners in the years they were made.

In docket No. 4668–69, respondent issued his statutory notice on August 11, 1969, and determined that Ray, as transferee, was liable for certain alleged tax liabilities of Selectivend. He explained the liabilities as follows:

### EXPLANATION OF ADJUSTMENTS

(a) We have determined that you are not entitled to the claimed net operating loss deduction of $48,264.66 in 1964 because your net operating loss carryover from prior years was completely absorbed before 1964. Therefore, your taxable income is increased $48,264.66.

(b) We have determined that Mr. Ray A. Maher was the primary obligor on the promissory notes issued to acquire the capital stock of Selvex Corporation, Inc., and that you had no legal or moral obligation to make the interest payments thereon. Therefore, you are not entitled to the claimed interest expense deductions of $12,500.00 in 1965, $11,250.00 in 1966 and $10,000.00 in 1967, and taxable income is increased by $12,500 in 1965, $11,250.00 in 1966 and $10,000.00 in the taxable year 1/1/67 to 7/31/67.

### OTHER ADJUSTMENTS

We have determined that you are not entitled to an investment credit carryover from 1962 and 1963 to 1964. Therefore, the $1,022.90 claimed on your 1964 income tax return as a carryover is disallowed, and the investment credit of $1,418.00 earned in 1964 is allowed.

The issues concerning the net operating loss in 1964 and the investment credit carryover in 1964 were the subject of a lawsuit in the Federal District Court for the Western District of Missouri at Kansas City, Mo,, tried in early 1969. The proper amount of the tax liability of Selectivend, insofar as these two issues are concerned, depended on the decision in that case which was handed down in favor of respondent in June of 1970. Petitioner, Ray, concedes that Selectivend was liable for the taxes as determined in that decision.

OPINION

*Dockets Nos. 4667–69 and 2916–67.*—Ray assigned his rights in Selvex stock to Selectivend in exchange for Selectivend's assumption of his promissory notes made out to Nova and Harry. Petitioners argue that this was a sale or exchange of a capital asset, namely "a right to a contract to purchase stock of Selvex," which resulted in no gain under section 1001 and 1002, since the "basis" in the "contract to purchase the stock" and the consideration received from Selectivend were the same.

Respondent, on the other hand, argues that the transaction was a redemption of stock under section 304(a)(1),[2] which did not constitute an "exchange of stock" under section 302(a) and (b)(1),[3] hence the property received is taxable as a dividend under section 301(a),[4] as required by 302(d).[5] Alternatively, respondent argues that the transaction constituted a constructive dividend to Ray, taxable pursuant to section 301(a). In either case, if we hold for respondent,

---

[2] SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.

  (a) TREATMENT OF CERTAIN STOCK PURCHASES.—

    (1) ACQUISITION BY RELATED CORPORATION (OTHER THAN SUBSIDIARY).—For purposes of sections 302 and 303, if—

      (A) one or more persons are in control of each of two corporations, and

      (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,

then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

[3] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

  (a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

  (b) REDEMPTIONS TREATED AS EXCHANGES.—

    (1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

[4] SEC. 301. DISTRIBUTIONS OF PROPERTY.

  (a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

[5] SEC. 302(d). REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

we must further decide whether petitioners are taxable in the years Selectivend made payments on the promissory notes or in the year it assumed the liability.

At the outset we note that the record is somewhat unclear as to whether Nova received her installment note purely in consideration for her "sale" of Selvex stock, so that the $125,000 in cash was paid her for the other three stocks. Likewise, aside from Harry's statement at trial that Bowersock was paid $125,000 under the agreement before the assignment, there is no explicit statement in the record that the two $125,000 cash payments to Bowersock and to Nova were made. However, there would have been a default on the agreement had the two $125,000 payments not been deposited in the escrow account and thereafter received by Nova and Bowersock, and since there is no indication that such a default ever occurred, we think it reasonable to conclude that the amounts were deposited and received. Also, an agreed proposed finding of fact states that the amounts were paid, and that the installment notes were solely in payment for the Selvex stock. We proceed on these two premises.

Under section 304(a)(1), if "one or more persons are in control of each of two corporations," and "one of the corporations acquires stock in the other corporation from the person (or persons) so in control," then the property received is to be treated "as a distribution in redemption of stock of the corporation acquiring such stock." Petitioners' argument, as we construe it, is that Selectivend did not acquire stock in Selvex but rather "a right to a contract to purchase stock" in that corporation; and so therefore, section 304(a)(1)(B)'s requirement that one corporation acquire the stock of another is not met and hence no redemption occurred. They argue that there was no intention that title to Selvex stock pass at the time of the agreement between Ray and the sellers and that title did not pass until the conditions of the escrow agreement were fulfilled; hence that no stock was relinquished by Ray to Selectivend and section 304(a)(1) is inapplicable. Petitioners contend further that Ray sold a "right in a contract to purchase stock" simply as a vendor and not in his capacity as stockholder and that under section 1.301–1(c), Income Tax Regs.,[6] said transaction cannot constitute a dividend.[7] We do not agree.

As we view the agreement, placing the title to the Selvex stock in escrow was no more than a security arrangement for the benefit

---

[6] (c) *Application of section to shareholders*—Section 301 is not applicable to an amount paid by a corporation to a shareholder unless the amount is paid to the shareholder in his capacity as such.

[7] Petitioners did not contend that the control requirements of sec. 304(c) were not met due to the manner of the arrangement and, accordingly, this is not an issue.

of the sellers to facilitate repossession in case of Ray's default. As Harry stated at trial, the agreement was structured such that in case of default by Ray on payments or conditions—

by having the stock endorsed in blank in the hands of the escrow agent, we could take over immediately. That was the reason we set it up that way, rather than making a complete sale and taking back mortgage security. We didn't want to have some litigation to take possession.

For all practical purposes Ray was owner of the Selvex stock at the time of the transaction with Selectivend. He had the right to vote the stock except in case of default and hence was in effective control of the corporation. To be sure he was under a duty to employ competent management satisfactory to the sellers but this was merely a means of protecting the value of the security, i.e., the stock, and such a duty is not uncommon when stock is used as security. Indeed, he was under the same obligations with regard to the stocks of the other three corporations, which were paid for in cash. These stocks remained in escrow as security for payment of the notes, as well as security for release of the guarantees on the loans by the sellers.

The agreement of April 26, 1963, had substance as well as form. Written, enforceable promissory notes obligated Ray. (Selectivend was subsequently obligated on them in its December 31, 1963, contract with Ray.) The price of the stock was definitely fixed. The terms utilized in the agreement were that of "buyer" and "seller." Ray also paid significant sums to Nova and Bowersock under the contract and while these sums were not allocated to the stock of Selvex, they, nevertheless, were for the corporations closely interrelated with the operations of Selvex. There is no indication in the record that as of the time of the agreement, it was impossible for Ray to complete its terms or that the purchase was illusory; nor is there any indication that Ray was not personally liable if default occurred. The agreement was a binding contract of sale for the stock of Selvex and the other corporations.

Many of the factors enumerated have been considered significant on the side of a holding that a "sale or exchange" under section 1001 has occurred as of the time an agreement is made. This is an area of the law to which we think there is a significant analogy for purposes of our ascertaining whether Ray had a sufficient interest in the Selvex stock to be considered its owner and subsequent seller for purposes of section 304. In sale-or-exchange cases courts have considered: (1) Whether legal title to the property has passed, *Ted F. Merrill*, 40 T.C. 66, 74, affirmed per curiam 336 F.2d 771 (C.A. 9, 1964); (2) whether the transferee has obtained possession of the property, *Floyd R. Clodfelter*, 48 T.C. 694, 701 (1967), affd. 426 F.2d 1391 (C.A. 9, 1970); (3) whether the sale price of the property is definitely fixed,

*Floyd R. Clodfelter, supra;* (4) whether there has been a significant amount of the agreed price paid, *W. H. Hay*, 25 B.T.A. 96, 101 (1932); (5) the intention of the parties, *Ted F. Merrill, supra* at 75; (6) descriptive terms utilized in the agreements such as "buyer" or "seller," *Floyd R. Clodfelter, supra;* and (7) whether an effective date has been agreed upon fixing a specific time for recognition of the rights and obligations of the parties, *Floyd R. Clodfelter, supra.*

The teaching of these cases is that the transaction is to be viewed as a whole and in the light of realism and practicality, and absence of any one factor will not preclude a holding that a "sale or other disposition" has occurred.

In section 1001 cases it has also been held that the retention of title in the seller for security purposes alone (as is the case herein under consideration) should be treated no differently than had the seller transferred the title to the purchaser and taken back a mortgage. When the methods of securing payment have the same objectives and effects, there is considered to be a sale or exchange as of the date of the agreement. *Floyd R. Clodfelter, supra; J. W. McWilliams*, 15 B.T.A. 329, 342–343 (1929).

In the instant case while formal title did not pass, the deposit of title in escrow was merely for security purposes. The agreement in substance was a sale of the stock. The fact that no cash was specifically paid on the Selvex stock is of minimal importance since cash was paid for the other three stocks of corporations which were closely allied. Other factors clearly point to a sale of Selvex stock to Ray and his equitable ownership in that stock at the time of the assignment to Selectivend. We hold that Ray was the equitable owner of the Selvex stock, and the transfer of his interest did fall within the requirement of section 304(a)(1)(B) that stock be acquired. Cf. *Wall* v. *United States*, 164 F.2d 462 (C.A. 4, 1947). We do not construe the statute to encompass only a formalistic transfer of title from one party to another in order that an acquisition take place. To do so would allow an easy route to circumvention and frustration of the statute's purpose. This purpose was succinctly stated in *Allan S. Vinnell*, 52 T.C. 934, 941 (1969), to—

prevent a taxpayer from using brother-sister corporations which he controls as an instrumentality for "bailing out" corporate earnings at capital gains rates. It requires the transaction to be viewed through the section 302 glass with its accompanying safeguards against dividend equivalency, rather than as a sale of stock to an unrelated third party.

As will become evident shortly, the facts of the instant case but thinly disguise the reality of a dividend distribution to Ray.

Petitioners contend that even if the requirements of section 304 (a)(1) are met, the redemption was not essentially equivalent to a

dividend because there were legitimate business purposes for the redemption; and hence section 302(b)(1) applies to treat it as in exchange for stock under section 302(a). According to petitioners the redemption was undertaken to insure continuity of business and provide economies in operation.[8]

Any such argument in determining whether a distribution is essentially equivalent to a dividend has been put to rest by the Supreme Court's decision in *United States* v. *Davis*, 397 U.S. 301 (1970), wherein the Court held that business purpose was irrelevant in determining dividend equivalence. The Court stated:

If a corporation distributes property as a simple dividend, the effect is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders. Where a redemption has that same effect, it cannot be said to have satisfied the "not essentially equivalent to a dividend" requirement of § 302(b)(1). Rather, to qualify for preferred treatment under that section, a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation. Clearly, taxpayer here, who (after application of the attribution rules) was the sole shareholder of the corporation both before and after the redemption, did not qualify under this test.

In the instant case there was no meaningful reduction in Ray's proportionate interest in Selvex. Under the attribution rules of section 318(a)(1)(C):

If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such person shall be considered as owning the stock owned, directly or indirectly, by or for such corporation, in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation.

For purposes of the attribution rules, Ray was still the owner of the Selvex stock after the assignment. His interest remained unchanged, since his stock interest in Selectivend constructively constituted him the sole shareholder of Selvex. See *Allan S. Vinnell, supra* at 943. At the same time he had received the "benefit" of an assumption of his liabilities to Nova and Harry and was in the same ultimate position as if he had received cash from Selectivend as a dividend with which he had paid off his notes. Cf. *Wall* v. *United States, supra* at 465. The redemption was essentially equivalent to a dividend and does not meet the test of section 302(b)(1).

Petitioners argue further however that section 1.301–1(c), Income Tax Regs., applies to preclude dividend treatment under section 301. According to this regulation, no distribution of property occurs and

---

[8] This argument was made indirectly through petitioners' attempt to distinguish various cases which discussed business purpose as a factor in ascertaining the applicability of sec. 302 when sec. 304 applied.

hence there is no dividend under that section if property is received in the capacity of vendor, rather than shareholder. They argue that the real reason why Selectivend agreed to buy Ray's "contract for the purchase of Selvex stock" was to acquire the valuable assets of that corporation and hence it was dealing with him in his capacity as vendor.

Section 302(d) specifically constitutes a redemption which does not qualify under section 302(a) as a distribution of property to which section 301 applies. Thus, once section 302(d) comes into play there can be no contention that section 301 does not apply or that the regulation precludes its application. Aside from this point, property distributed in a redemption must be deemed to come to an individual in his capacity as a shareholder. It is impossible to separate his capacity as vendor from his capacity as shareholder when stock in a corporation is redeemed by that same corporation or a related corporation. Moreover, petitioners' argument that Selectivend was buying the stock to acquire valuable assets (and thus that section 301 does not apply, at least in the context of a section 302 redemption) is no more than an indirect assertion that there was a legitimate business purpose for the transaction and that thus the redemption was not essentially equivalent to a dividend. We think this argument is completely answered and precluded by the recent *Davis* decision of the Supreme Court.

At this juncture we must decide in what year a dividend was received, either 1963, when there was an assumption of the liability, or in 1965, 1966, and 1967, when the notes were paid by Selectivend. Petitioners vigorously argue that no property was received in 1963 because Ray remained primarily liable on the note, even though Selectivend assumed the liability, and as between Ray and Selectivend, Selectivend was in substance liable. They thus argue that section 304(a)(1) does not apply in 1963 since no property was received by Ray as required by that section and accordingly there was no distribution of property taxable as a dividend under section 301. Respondent on brief argued that the transaction constituted a redemption, but did not deal in specifics as to the year or years of inclusion. He did not concede that the years of payment were the proper years; nor did he abandon his initial determination in docket No. 2916–67 that the proper year of taxation was 1963. Hence the question is still before us.

Petitioners' main reliance in support of their contention that there was no taxable distribution in 1963 is based on section 1.301–1(m), Income Tax Regs., which states:

(m) *Cancellation of indebtedness.* The cancellation of indebtedness of a shareholder by a corporation shall be treated as a distribution of property.

According to them, there was no cancellation of Ray's indebtedness to Nova and Harry and therefore, under this regulation, there can be no receipt of property in 1963.

We do not interpret the above regulation to preclude treatment of an assumption of liability as property under section 301 or section 304. It merely defines one instance involving an indebtedness of the shareholder which, when canceled, constitutes a distribution of property. It does not assert or imply that this is to be considered the exclusive instance. Moreover, the regulation, as we construe it, applies only in a situation wherein the stockholder is indebted to the corporation, as opposed to a third party, and the corporation, cancels the stockholder's indebtedness to it; therefore, no contrary implication as regards a stockholder's debt to a third party would apply in the instant case. We must look elsewhere for an answer.

Section 317(a) defines property as follows:

SEC. 317. OTHER DEFINITIONS.

(a) PROPERTY.—For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).

There are no cases directly in point as to an interpretation with regard to the term "property" in section 317. It has, however, been settled in other areas of the Code that an assumption of liability does constitute money equivalence within the meaning of various Code provisions. The term "money received" under section 1001(b) includes assumption of liability, and in ascertaining gain on the sale or exchange of a capital asset said assumption is included in the face amount of the debt assumed. *Crane* v. *Commissioner*, 331 U.S. 1, 12–14 (1947); *Smith* v. *Commissioner*, 324 F.2d 725 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; *Teitelbaum* v. *Commissioner*, 346 F.2d 266 (C.A. 7, 1965), affirming a Memorandum Opinion of this Court. Likewise, in interpreting the term "money or other property" within the meaning of section 112(c)(1) of the Revenue Act of 1932,[9] which was an adjunct to various nonrecognition provisions of the Code at that time, it was held that the assumption of liability constituted "the equivalent of money." *United States* v. *Hendler*, 303 U.S. 564 (1938); *Brons Hotels, Inc.*, 34 B.T.A. 376 (1936); *Walter F. Haass*, 37 B.T.A.

---

[9] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(c) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—

(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

948 (1938), and that the gains were to be recognized to that extent.[10]

In *Brons Hotels, Inc., supra* at 381, the Board stated:

We are not unmindful of the fact that the assumption of a mortgage is not money in a true legal sense. It is, however, part of the consideration received; it is the equivalent of money, and in our opinion must be treated as money for the purposes of this case.

The reasons behind the inclusions of debts assumed are primarily those of practicality and the realistic fact that a benefit has occurred in that year. Cf. cases cited *supra*.

By analogy the conclusion is inescapable that the assumption by Selectivend of Ray's liability likewise constituted "money" in the face amount of the obligation under the definition of property in section 317(a) and, therefore, there was a distribution of property, which constituted a dividend in the year of assumption. There is no reason to treat the term "money" in the definition of "property" under section 317(a) any differently than the term "money received" in section 1001(b) or the term "money" under prior Code provisions. Petitioners received a benefit. The practical considerations still exist. To be sure, Ray was still liable if the corporation defaulted, but the very statement of this fact demonstrates that Ray's liability was no longer primary, as petitioners argue, but was now secondary. Also, Ray would have had an enforceable right against the corporation if he had been required to pay. In practical effect, however, he would not be forced to pay unless, after default, sale of the collateral security had proved inadequate to pay the remaining balance of the debt due. There is no indication that the security for the assumed notes was at all inadequate. We hold that petitioners are taxable to the extent of the earnings and profits of Selectivend in 1963 on the face amount of the obligations. The earnings and profits were $232,485.99, and hence the distribution is taxable only to that extent in 1963.

*Docket No. 4668-69.*—Petitioner is liable as transferee under section 6901 for any taxes due from Selectivend but contends that he is not liable for taxes due from Selectivend in 1964 and 1965. He argues that no notice of deficiency for 1964 or 1965 was sent to Selectivend within 3 years after the corporate returns were filed for those years; and hence that the statute of limitations (sec. 6501(a)) ran as to any assessment against Selectivend and precludes any liability of Selectivend.[11] According to petitioner, since a "deficiency" is defined under

---

[10] Congress has in certain instances specifically included or excluded assumption of liability as property within the meaning of various nonrecognition provisions. See sec. 357; sec. 1031(d). The enactment of the predecessors to some of these provisions was in direct response to court decisions in this area, including those above mentioned, holding that assumption did constitute money. See *Jack L. Easson*, 33 T.C. 963, 969 fn. 7 (1960), reversed on another ground 294 F.2d 653 (C.A. 9, 1961).

[11] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(a) GENERAL RULE.—Except as otherwise provided in this section, the amount of any

section 6211 as the excess of correct tax over that shown in the return and since Selectivend fully paid its taxes noted in its returns for 1964 and 1965, there were no unpaid taxes for those years and no deficiencies to which section 6901(a)[12] may apply. In short, petitioner contends that there must first be sent a notice of deficiency to the taxpayer, Selectivend, within the 3-year period of limitations in order for any liability to attach to the transferee.[13]

The above argument is not new and has been rejected in the past. It is well settled that in an instance such as is here under consideration, there is no need for a statutory notice of deficiency against the taxpayer in order to impose liability on the transferee, for to require such when the taxpayer has dissolved and has no assets is to require a useless act. *Henry A. Kuckenberg*, 35 T.C. 473 (1960), affirmed on this issue 309 F.2d 202 (C.A. 9, 1962), certiorari denied 373 U.S. 909 (1963); *W. W. Cleveland*, 28 B.T.A. 578 (1933), affirmed on this point 77 F.2d 184 (C.A. 5, 1935); *United States* v. *Floersch*, 276 F.2d 714 (C.A. 10, 1960), reversing and remanding 171 F.Supp. 260 (D. N. Mex. 1959), certiorari denied 364 U.S. 816 (1960).

In *W. W. Cleveland, supra* at 580–581, the Board stated:

> In our opinion the first point in petitioners' contention, as above set out, is without merit. A deficiency is not created by any act of the respondent, but by the facts and the legal significance thereof as set out in the taxpayer's income tax return.[1] The so-called "60-day letter" is no more than notice to the taxpayer that the amount of a deficiency disclosed by its return has been determined under the applicable statute. In our opinion no assessment, notice, or other act of the respondent is necessary to establish liability for income taxes. We think that any deficiency existing at the date of a transfer of assets is a liability against such assets under the trust fund theory. *United States* v. *Garfunkel*, 52 Fed. (2d) 727; *Helen Dean Wright*, 28 B.T.A. 543.
>
> The question here raised by the petitioners is material only as to whether the respondent exhausted all means to collect the unpaid taxes from the taxpayer before he proceeded against its stockholders as transferees of assets impressed with a trust in favor of the revenue. The record shows that during the years under review the taxpayer had no assets other than its receipts from the Commission and that such receipts were distributed to the petitioner as and when received. At March 4, 1932, the date at which respondent determined the liabili-

---

tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

[12] SEC. 6901. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) INCOME, ESTATE, AND GIFT TAXES.—

(A) TRANSFEREES.—The liability, at law or in equity, of a transferee of property—

[13] In stipulation 18, petitioner stated that he was liable for taxes, if we find the statute of limitations not to have run, and this is the only issue we deal with. On brief, petitioner has indirectly raised questions concerning whether, under Missouri law, he was liable. He has precluded any such argument under the stipulation.

ties of petitioner under section 311 of the Revenue Act of 1928, the taxpayer had no assets, and the respondent was without any means to enforce the collection of the deficiencies in question. In these circumstances it is clear that liabilities against the petitioners were properly determined unless barred by the statute of limitations at the date of such determination.

[Footnote omitted.]

We went on to hold that even though the statute of limitations had run, as against the transferor, to one of the years in issue, the transferee was liable since a proper notice had been sent to him within 1 year after the expiration of the period for assessment of the transferor, as was required by the predecessor to section 6901(c)(1).[14]

The above result finds direct support in legislative history. With respect to the procedural requirements of notice of deficiency, the following statement was made (H. Rept. No. 356, 69th Cong., 1st Sess., 1939-1 C.B. (Part 2) 372):

Section 274(a) [predecessor of sections 6212 and 6213] requires notice of a deficiency in a tax to be sent the taxpayer before further proceedings for collection of the tax liability are continued. The section, however, in terms applies only to a deficiency in a tax and does not apply to the liability of a transferee in respect of the tax of the taxpayer. *Therefore, in proceedings against the transferee, notice need not be given the taxpayer under section 274(a).* However, under the substitute agreed to by the conferees, the liability of the transferee is collected in the same manner as the liability for tax. Section 274(a) is thus incorporated by reference, but the result of such reference is that for procedural purposes the transferee is treated as a taxpayer would be treated, and under section 274(a) notice would be sent to the transferee (and not the taxpayer) in proceedings to enforce the liability of the transferee. [Emphasis supplied.]

Accordingly, no notice to Selectivend was necessary in the instant case.

Since Ray agreed to the extension of time for his liability, and the notice of deficiency was issued as to him within the period of extension, he is liable as transferee for taxes due from Selectivend in 1964 and 1965.

Various issues remaining in this docket as to Selectivend's liability for taxes in 1964 were the subject of litigation in the U.S. District Court for the Western District of Missouri at Kansas City. It is

---

[14] SEC. 6901. TRANSFERRED ASSETS.

(c) PERIOD OF LIMITATIONS.—The period of limitations for assessment of any such liability of a transferee or a fiduciary shall be as follows:

(1) INITIAL TRANSFEREE.—In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor;

agreed that that court's decision disallowing the investment credit and loss carryover is determinative as to Ray's liability as transferee for any taxes due from Selectivend for 1964 if we hold herein, as we have done above, that the statute of limitations has not run. There does remain, however, an issue as to the deductibility of Selectivend's payment of interest on the notes which it assumed.

Respondent argues that the "interest" which Selectivend paid on the notes in 1964, 1965, and 1966 did not constitute a business expense under section 162(a) nor an interest deduction under 163, but rather, was a constructive dividend to Ray under section 301. According to respondent, Ray received a "benefit" in that he was released from any liability to pay interest on the loans for those years. Respondent has conceded that Ray is entitled to offsets for interest deductions under section 163, if we so hold.

We cannot agree that the corporation is not entitled to interest deductions. In *Deputy* v. *DuPont*, 308 U.S. 488, 498 (1940), the U.S. Supreme Court stated that "Interest on indebtedness means compensation for the use or forbearance of money." In essence, once Selectivend assumed the obligations in 1963, it was paying for money which it was using in its business. Instead of repaying the loans and avoiding the payment of interest it chose to utilize the money made available by the loans and retain the benefits thereof. Ray no longer had the use of the money represented by the notes. In 1963 he had relinquished his "stock" in exchange for Selectivend's assumptions, and he has been treated as if he had received $250,000 (the face value of the notes), because of the assumptions. At this point, the transaction must realistically be viewed as though Selectivend had borrowed $250,000 from Nova and Harry in order to pay Ray, with Ray guaranteeing the loans. Consequently, Ray should be treated no differently than any person secondarily liable, and clearly no one is taxed merely because he does not have to pay on a guarantee which never becomes due. Ray, therefore, received no constructive dividends because of the interest payments. At the times of the payments the corporation had the benefit of the loans and also the obligations, under its contract with Ray. Hence the corporation is entitled to interest deductions under section 163.[15] Cf. *New McDermitt, Inc.*, 44 B.T.A. 1035 (1941).

*Decisions will be entered under Rule 50.*

---

[15] This holding, of course, precludes the allowance of an interest deduction to petitioners in these years in docket No. 4667–69, since such deduction was premised on a constructive dividend having been received by Ray.