CLAUDE J. LISLE and VI LISLE, ET AL [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Lisle v. Commissioner
Docket Nos. 1760-73, 1849-73, 1851-73, 1852-73
United States Tax Court
T.C. Memo 1976-140; 1976 Tax Ct. Memo LEXIS 263; 35 T.C.M. (CCH) 627; T.C.M. (RIA) 760140; May 4, 1976, Filed *263 Corporate petitioner purchased all the stock of its two principal shareholders under agreements providing for down payments and deferred payments extending over 20 years. The individuals retained right to vote, their membership on the board of directors and their positions as officers, although they received no compensation therefor and did not actively participate in the management of the corporation. Held: The 20-year payout period does not perse prevent the sale from qualifying as a redemption under Sec. 302(b)(3), I.R.C. 1954. The right to vote served merely as additional security for payment of the purchase price by insuring management control in the remaining shareholders. Retention of membership on the board of directors and officer positions were in name only. Considering all of the relationships of the parties as altered by the sales agreements and the activities of the parties subsequent to entering into the agreements, the transaction terminated the shareholders' interests in the corporation under Sec. 302(b)(3) qualifying as a redemption under Sec. 302(a), I.R.C. 1954. The corporation, from time to time, had accounts receivable from two officers-directors-shareholders *264 on which no interest was charged. The Commissioner determined that they constructively received interest income for the use of such accounts. J. Simposon Dean,35 T.C. 1083 (1961), distinguished on facts. Truman F. Campbell, counsel for petitioners in docket No. 1760-73. Kendall L. Manock and Robert Fishman, counsel for petitioners in docket No. 1849-73. Baxter K. Richardson, counsel for petitioners in docket Nos. 1851-73 and 1852-73. Edward B. Simpson, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as follows: Petitioners
Docket No.
Year
Deficiency
Claude J. and Vi Lisle
1760-73
1968
$ 1,778.47
1969
1,822.55
1970
9,158.00
Joel R. and Helen Lisle
1849-73
1968
$ 653.57
1969
786.33
1970
840.00
Lisle Funeral Home
1851-73
1969 *
$ 8,415.00
1970 *
11,341.00
1971 *
16,367.00
Roy A. and Esther Franz
1852-73
1968
$ 702.42
1969
920.38
1970
1,365.00
These cases have been consolidated for trial, briefs and opinion. Some of the issues have been settled. The issues remaining for decision are: (1) Whether Petitioners Joel *265 R. Lisle and Claude J. Lisle transferred a sufficient interest in their stock in Lisle Funeral Home to Lisle Funeral Home to qualify payments received therefor as payments in redemption of their stock within the meaning of section 302(a), Internal Revenue Code of 1954; [2]
(2) Whether payments made by Petitioner Lisle Funeral Home were interest payments pursuant to redemption of its stock in installments or dividend payments; and (3) Whether Petitioners Joel R. Lisle and Roy A. Franz received constructive dividend income from the interest-free use of corporate funds. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by reference. Petitioners Joel R. and Helen Lisle, husband and wife, resided in Corona Del Mar, California, when they filed their petition. They filed joint Federal income tax returns for the taxable years 1968, 1969 and 1970, prepared on the cash receipts and disbursements method, with the District Director of Internal Revenue, San Francisco, California. Joel R. Lisle lived continuously in Fresno, California, from 1946 until *266 September 1966, when he moved to Corona Del Mar, which is about 270 miles from Fresno. Petitioners Claude J. and Vi Lisle, husband and wife, resided in Fresno, California, when they filed their petition. They filed joint Federal income tax returns for the taxable years 1968, 1969 and 1970, prepared on the cash receipts and disbursements method, with the District Director of Internal Revenue, San Francisco, California. Petitioners Roy A. and Esther Franz, husband and wife, resided in Fresno, California, when they filed their petition. They filed joint Federal income tax returns for the taxable years 1968, 1969 and 1970, prepared on the cash receipts and disbursements method, with the District Director of Internal Revenue, San Francisco, California. Petitioner Lisle Funeral Home, a California corporation, had its principal office and place of business in Fresno, California, at all times material herein. It filed its corporate Federal income tax returns for the taxable years ending March 31, 1969, 1970 and 1971 with the Internal Revenue Service Center, Ogden, Utah. Joel and Claude Lisle are brothers and their father was John N. Lisle. John Lisle operated a mortuary business in *267 Fresno as a sole proprietorship until March 19, 1951, when it was incorporated as Lisle Funeral Home, a petitioner herein. The funeral home issued only voting common stock and the maximum shares outstanding at any given time were 750 shares. John Lisle owned all of the issued and outstanding stock and dominated the corporate affairs until he divested himself of all his shares by gifts to his sons, Joel and Claude Lisle. On April 1, 1966, the stockholdings in Lisle Funeral Home were as follows: Name
No. of Shares
Joel R. Lisle
210
Claude J. Lisle
210
Robert D. Lisle
50
Lucian L. Minor
40
Howard Kauffman
5
Roy A. Franz
8
Lew Seavy
7
Winston Stafford
4
Joyce Duncan
7
Louie Poletti
7
Lillian Stafford
4
Maxine Hendry
1
Roy Gay
3
Lisle Funeral Home (shares
previously acquired)
194
TOTAL
750
The above-named persons owning stock were also employees of Petitioner Lisle Funeral Home and all such persons, other than Joel and Claude, acquired their stock from time to time in lieu of cash bonuses. On or about October 26, 1966, Petitioner Roy A. Franz purchased from Lucian L. Minor his 40 shares of stock for $32,000. The members of the board of directors of Petitioner Lisle Funeral Home at all times from and after the organization *268 of petitioner, up to and including March 31, 1974, were as follows: Date of Name
Date of Election
Termination
John N. Lisle
4/ 2/51
1962
Claude J. Lisle
4/ 2/51
3/26/74
Joel R. Lisle
4/ 2/51
3/26/74
Fred W. Lisle
4/ 2/51
5/31/55
Bonnie Garberson
4/ 2/51
4/15/55
John Guerard
5/31/55
9/13/61
L. M. Horg
5/31/55
Robert D. Lisle
11/ 2/61
Lucian L. Minor
11/ 2/61
10/10/66
Roy A. Franz
12/27/65
Since March 26, 1974, the board of directors of Lisle Funeral Home consisted of three members. The officers of Petitioner Lisle Funeral Home at all times from and after the organization of petitioner, up to and including March 31, 1974, were as follows: Name
Offices Held
Dates
John N. Lisle
President
4/ 2/51 to 8/13/62
Fred W. Lisle
Treasurer
4/ 2/51 to 5/31/55
Joel R. Lisle
Secretary
4/ 2/51 to 8/13/62
Treasurer
5/31/55 to 8/18/62
Vice Pres.
8/13/62 to 3/27/74
Claude J. Lisle
Vice Pres.
4/ 2/51 to 8/13/62
President
8/13/62 to 6/26/70
Chairman of
the Board
6/26/70 to 3/27/74
L. L. Minor
Gen. Mgr.
10/29/54 to 10/10/66
Vice Pres.
5/31/55 to unknown
Treasurer
8/13/62 to 10/10/66
Robert D. Lisle
Asst. Sec.-
Treasurer
5/31/55 to 8/13/62
Secretary
8/13/62 to 10/10/66
Vice Pres.
& Gen. Mgr.
10/10/66 to 6/26/70
President
6/27/70 to date
Roy A. Franz
Treasurer
10/10/66 to date
Secretary
& Gen. Mgr.
6/26/70 to date
*269 The corporate bylaws set forth the duties and responsibilities of the chairman of the board of directors, president and vice president as follows: Section 6. Chairman of the Board. The chairman of the board, if there shall be such an officer, shall, if present, preside at all meetings of the board of directors, and exercise and perform such other powers and duties as may be from time to time assigned to him by the board of directors or prescribed by the by-laws. Section 7.President. Subject to such supervisory powers, if any, as may be given by the board of directors to the chairman of the board, if there be such an officer, the president shall be the chief executive officer of the corporation and shall, subject to the control of the board of directors, have general supervision, direction and control of the business, and officers of the corporation. He shall preside at all meetings of the shareholders and in the absence of the chairman of the board, or if there be none, at all meetings of the board of directors. He shall be ex officio a member of all the standing committees, including the executive committee, if any, and shall have the general powers and duties of management usually *270 vested in the office of president of a corporation, and shall have such other powers and duties as may be prescribed by the board of directors or the by-laws. Section 8. Vice President. In the absence or disability of the president, the vice presidents in order of their rank as fixed by the board of directors, or if not ranked, the vice president designated by the board of directors, shall perform all the duties of the president, and when so acting shall have all the powers of, and be subject to all the restrictions upon, the president. The vice presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the board of directors or the by-laws. [Article IV of Bylaws.] * * *
During 1965, Joel Lisle, nearing 60 years of age, decided to retire from active employment at the funeral home because funeral service arrangements for friends increasingly disturbed him. In December of 1965, Lucian L. Minor, a shareholder and employee of the funeral home, approached Joel Lisle and Claude Lisle regarding the possibility of their selling their respective interests in the funeral home. From January 1966 through the end of *271 August 1966, Mr. Minor negotiated with Joel and Claude Lisle and L. M. Horg, a board of directors member and accountant for the funeral home, with a view toward the acquisition of control of the funeral home. Near the end of negotiations, on or about August 23, 1966, Mr. Minor caused to be prepared and submitted to Joel and Claude Lisle an offer to acquire all their shares in the funeral home. In general, the offer provided for a total consideration to them of $306,000 each, consisting of $168,000 for the purchase of their respective 210 shares and the balance of $138,000 applied to a covenant not to compete. The total consideration to each was payable $25,000 down with the balance payable over 20 years at 6-1/4 percent interest. Claude Lisle made it clear during the negotiations that he did not wish to terminate his employment at the funeral home. It was, therefore, also agreed that Claude Lisle should continue to be employed in the business at a salary of $12,500 per year until retirement. During September of 1966, Robert D. Lisle became aware of the negotiations and the intended sale and he approached Petitioner Roy A. Franz to determine whether he was willing to join together *272 in an attempt to acquire the funeral home in lieu of Mr. Minor. Robert D. Lisle was an employee of the funeral home and is the natural son of Blanch Green who married Claude Lisle after Robert's birth. Claude Lisle is not Robert Lisle's natural father. Blanch and Claude Lisle were divorced; Blanch Lisle remarried and, in a legal proceeding, Robert Lisle was adopted by his mother's new husband. In a subsequent legal proceeding, Robert was granted the legal name of Robert D. Lisle. Robert Lisle is not considered a child of Claude Lisle's for purposes of section 318(a)(1)(A)(ii), of the Internal Revenue Code. Between September 13 and September 30, 1966, Robert Lisle, Roy Franz and L. M. Horg negotiated with a view toward making an offer at the price and with similar terms as the offer of Lucian Minor. Ultimately, on November 22, 1966, a document entitled "Redemption Agreement" (Joel Lisle's redemption agreement) was executed by Joel Lisle, as seller, and by Robert Lisle and Roy Franz on behalf of the corporation and as individual guarantors. The agreement provided that Joel Lisle would sell all of his stock to the corporation for $173,760, payable $25,000 in cash and the balance *273 in 240 equal consecutive monthly installments with the declining balance bearing interest at 7 percent per annum. He also agreed to refrain from competing with the corporation for a consideration of $256,785 payable in 240 consecutive monthly installments of $1,069.93 each without interest. The following provisions were also agreed to: 5. Club Dues. So long as the Seller shall reasonably desire, but not to exceed five years, the Corporation shall, at its expense and in addition to the purchase price hereinabove provided, pay dues and assessments upon a social or nonresident membership in the University-Sequoia-Sunnyside Club for the benefit of Seller, Seller to bear all other costs, charges and expenses relating to said membership or the use of said Club by him, except to the extent to which he incurs them directly on behalf of the Corporation. [Redemption Agreement.] 6. Services to be Rendered by Seller. So long as Seller shall desire to, and shall, occasionally assist the Corporation in making funeral arrangements and in the conduct of funeral services, the Corporation shall furnish to him, at the Corporation's expense, suitable living quarters in Fresno, California, consisting *274 of either an apartment or other appropriate quarters. [Redemption Agreement.] * * *
13. Contingency as to Closing. It shall be a condition precedent to the closing of the transaction herein provided for that an employment contract for the Corporation, as employer, and CLAUDE J. LISLE, as employee, satisfactory to both parties and to Seller herein shall have been executed, it being understood that said agreement itself shall be contingent upon the execution and closing of the escrow herein provided for. [Redemption Agreement.] * * *
The redemption agreement was secured by the shares being sold, by a deed of trust on real properties of the corporation, by an assignment of life insurance policies on the lives of Robert Lisle and Roy Franz, and by the guaranty of another corporation, Lisle Properties, Inc., and supporting deeds of trust upon its real properties. Pursuant to Joel Lisle's redemption agreement, a "Security Agreement: Pledge of Stock" was executed which provided that collateral consisting of Joel Lisle's 210 shares of Lisle Funeral Home stock and 50 shares owned by Robert Lisle and Roy Franz would be deposited with Kendall L. Manock as pledge holder. Pursuant to the redemption *275 agreement, the stock was to be deposited "together with assignments thereof." The certificates were not endorsed by Joel Lisle but they were, from May 25, 1967 until March 28, 1974, in the physical possession of the pledge holder. Paragraph 4 of the security agreement contained the following provisions: (e) Secured Party [Joel R. Lisle] shall be entitled to vote the full 210 shares of Debtors' Stock standing in the name of Lisle Funeral Home, as though Secured Party were the owner thereof and Secured Party or such person or persons designated by him may serve as a member of the Board of Directors of Debtors. (f) So long as Creditor is not default under any obligations secured hereby due and payable, all the stock held in pledge issued in the names of Robert D. Lisle and Roy A. Franz, may be voted by them. During any period while Debtors are in default, such stock may be voted by Secured Party [Joel R. Lisle]; any such period shall terminate upon the curing of the event of default in question in which case voting rights shall revert to Robert D. Lisle and Roy A. Franz, or upon foreclosure hereunder. On or shortly after November 22, 1966, Claude J. Lisle entered into an "Agreement *276 for Employment and for Option to Purchase or Exchange Stock" (Claude Lisle's 1966 agreement) with Lisle Funeral Home which was executed on behalf of Lisle Funeral Home by Robert Lisle and by Robert Lisle, Claude Lisle and Roy Franz as stockholders. Claude Lisle's 1966 agreement provided that Claude be employed by Lisle Funeral Home as its president and that his duties "shall be assigned from time to time by the board of directors of the Corporation." Claude Lisle agreed not to engage in competition with Lisle Funeral Home and he agreed to an annual salary of $23,595 subject to adjustment for changes based upon the cost of living index. Lisle Funeral Home received an option to purchase Claude Lisle's stock upon any event terminating his employment or at any time on or after March 31, 1973. "Such option must be exercised, if at all, only as to all such stock" owned by Claude Lisle at such time. The price at which the option was exercisable was $800 per share, adjusted for profit or loss of Lisle Funeral Home from April 1, 1966, to the date the option was exercised, payable $25,000 in cash at the time the option was exercised and the balance in 240 equal monthly installments with *277 interest at 7 percent per annum on the unpaid balance. The April 1, 1966, value of $800 was the value determined by L. M. Horg and utilized in Joel Lisle's redemption agreement. Claude Lisle's 1966 agreement also provided that if Lisle Funeral Home did not exercise its option to purchase the shares, then it had an option to require Claude Lisle to exchange his Lisle Funeral Home common stock for preferred stock. The voting rights retained by Joel Lisle in the security agreement accompanying his redemption agreement assured Joel Lisle that Robert Lisle and Roy Franz, as eventual owners of all or most of the outstanding shares in the funeral home, would be able to manage the corporation without interference from Claude Lisle. The voting rights also insured Joel Lisle that the exclusion of Claude Lisle from management would protect Joel Lisle's security from interference by Claude Lisle. Both Robert Lisle and Roy Franz desired that Joel Lisle retain voting rights during the period of payment to him of the balance of the redemption price with the expectation that Joel Lisle could and would use such voting rights to prevent attempts by Claude Lisle to interfere in the management of *278 Lisle Funeral Home.
After execution of Joel Lisle's redemption agreement, he did not exert influence on management as he had done previously. He did not confer with management outside the board of director meetings. The apartment made available to Joel Lisle pursuant to the redemption agreement was used only six times or less on trips to Fresno from Corona Del Mar for board of directors meetings. Joel Lisle supervised only one funeral service after November 1966. Joel Lisle remained an officer and director of the corporation until March 26, 1974.On one occasion after 1966, Joel Lisle guaranteed an obligation of the corporation in connection with its acquisition of certain property. Likewise, on one occasion the corporation guaranteed a loan by Joel Lisle. On or about November 13, 1969, Claude Lisle gave the corporation notice of an intent to retire from employment as of December 1, 1969. On December 10, 1969, a special meeting of the board of directors was convened to consider Claude Lisle's retirement. The minutes of the meeting recite that the president stated: * * * at this time, it would be possible only for the corporation to contract to purchase the stock from time to *279 time in the future, in accordance with the general plan of purchase thereof set forth in [Claude Lisle's 1966] Agreement, rather than all of the stock at this time, because earned surplus at this time of the corporation is insufficient for the entire purchase to take place. He therefore recommended that the corporation contract to purchase the stock, for a consideration in the amount and payable as set forth in said Agreement, such purchase to take place from time to time as payments were made on account of the basic obligation, for the reason that the corporation would in such manner always have sufficient earned surplus for purchases so made from time to time, in accordance with the overall plan and obligation to purchase all the stock to be lawful under the State of California. After discussion, the following resolution was adopted: NOW THEREFORE, BE IT RESOLVED, that this corporation shall purchase for a consideration of $1,160.00 per share, at the times and in the manner hereinafter set forth, all the shares of capital stock of this corporation owned by CLAUDE J. LISLE, being 210 shares, as follows: (1) This corporation shall make a payment to CLAUDE J. LISLE of Twenty-Five *280 Thousand Dollars ($25,000.00) at the closing of the escrow hereinafter provided for, and shall thereafter pay CLAUDE J. LISLE, two hundred forty (240) equal, consecutive monthly payments, the first calendar month following the month in which the said escrow shall have closed, the amount of each of such payments to be initially computed on the basis that this corporation shall pay by such installment a sum based upon payment of the total sum of $218,600.00 in 240 equal, consecutive monthly installments, with simple interest on the declining balance accruing from the close of escrow at 7% per annum; provided however, that as at each anniversary (prior to complete purchase by this corporation from CLAUDE J. LISLE of all of his said shares), the amount of each of the twelve equal, consecutive annual installments payable on the 1st day of each of the twelve, consecutive calendar months following the month in which such anniversary fell, shall be re-computed so that each such installment shall include the same amount on account of principal of the said total sum of $218,600.00 as if each such installment would have included without such re-computation, but each such installment shall include *281 simple interest on the declining balance, accruing from such anniversary date, at one plus the prime rate then being charged on such date by Bank of America National Trust and Savings Association, to prime borrowers at Fresno, California, but under no circumstances shall such interest rate ever exceed 8% per annum or be less than 6% per annum; provided further, that this corporation may at any time or times after December 31, 1970, prepay any part or all of the said total sum of $218,600.00 without penalty, any such prepayment to apply first to accrued interest and then to installments of principal next to fall due, but this corporation may in full at any time prepay all the unpaid balance of said sum of $218,600.00 plus all accrued interest; it being understood nevertheless, anything herein to the contrary notwithstanding, that shares shall be deemed to have been purchased from CLAUDE J. LISLE pursuant to this resolution only when, as and if payments, including the said initial payment of $25,000.00, and subsequent payments on account of principal of said sum of $218,600.00 shall be sufficient to purchase shares at the said purchase price of $1,160.00 per share, so that, for example, *282 the initial payment of $25,000.00 shall be deemed to have purchased, and shall result in a purchase, of 21.5517 of the shares which under the subject matter of this resolution, and until a share is deemed paid for, remain in the name of CLAUDE J. LISLE, subject however, to the effect of the right and obligation of this corporation to purchase the same pursuant to this resolution, and certificates evidencing shares not yet purchased shall from and after the close of escrow continue to be held in escrow pursuant to escrow agreement to be prepared by the attorney for this corporation, providing for annual releases of shares so paid for as at March 31, 1971, and as at each March 21st thereafter until all such shares have been paid. * * *
(3)(a) A security agreement which shall impose a security interest upon all shares actually sold and purchased from time to time pursuant to this resolution, whereby all such shares actually so sold and purchased shall be hypothecated as such security; and whenever a share or shares shall be deemed paid for and purchased hereunder, certificates evidencing the same theretofore in the name of CLAUDE J. LISLE shall be cancelled to the extent thereof, and *283 new certificates shall be issued evidencing the same, showing the effect of such security agreement, such new certificates to be kept pursuant to such security agreement.
* * *
(3)(d) The agreement of LISLE PROPERTIES, INC., a corporation, by which it shall guarantee such obligations and all other instruments and documents executed and delivered to provide security, such guaranty to be secured by deed of trust on real property owned by LISLE PROPERTIES, INC., to be a first lien on the property described there, subject nevertheless to current taxes, a lien not yet payable, to lien of deed of trust in favor of WELLS FARGO BANK now of record, and to lien of deed of trust now of record given by LISLE PROPERTIES, INC., as security for its guarantee of the obligations of this corporation to JOEL R. LISLE under that certain [Joel Lisle's] "Redemption Agreement" hereinabove in this resolution referred to. * * *
(4) RESOLVED FURTHER, that from and after the close of the escrow provided for in the next preceding resolution but one relating to the purchase of shares of stock in this corporation owned by CLAUDE J. LISLE, in order to assist this corporation in promoting its public relations and good *284 will, and solely for the convenience of this corporation in providing services to its clients, this corporation shall provide, free of rent or other expense, other than utilities, a residence for CLAUDE J. LISLE, and/or his wife in that certain residence commonly known as 1651 L Street, Fresno, for a period of five years (unless both CLAUDE J. LISLE and his wife shall decease within the next five years in which case such period shall end with the death of the second of them to die), and in order to facilitate attendance by CLAUDE J. LISLE at services being conducted by this corporation and his waiting upon friends in and about the business of this corporation, for a period of time extending from the expiration of the said five-year period (unless both CLAUDE J. LISLE and his wife shall die within said five-year period) until the date thereafter of occurrence of the earlier in time of the following events: (a) the requirement of this corporation of possession of the real property where said residence is located for other corporate purposes, or sale thereof in connection with a sale of the property occupied by the corporation known as 1605 L Street, Fresno, California, (b) the ceasing *285 by CLAUDE J. LISLE to render any services in promoting the public relations and goodwill of this corporation whether upon his death or otherwise. Pursuant to such resolutions, a document entitled "Agreement and Escrow Instructions" was executed on December 1, 1969, and provided that "Claude shall deposit in the said escrow all his certificates evidencing his shares of stock in the CORPORATION, being 210 shares in all." It further provided that the "escrow holder shall cause to be transferred to itself as Pledgee 21 of the shares of stock * * * and shall continue to hold in escrow for the time being the balance of said shares, being 189 shares, and the parties and the escrow holder shall from time to time cause such shares to be transferred from CLAUDE to the escrow holder as pledge holder * * * as such shares shall be paid for * * *." Other agreements provided Claude Lisle with additional collateral in which his rights were subordinate to the rights of Joel Lisle. Both of the security agreements provided that all dividends, current or liquidating, on any pledged stock whether in money or in stock or in kind, should be applied by the respective creditors to obligations of the debtors. *286 Claude Lisle's security agreement provided similarly to that of Joel Lisle; i.e., Claude Lisle was entitled to vote all shares in the name of the pledge holder as though he were the owner thereof. On March 3, 1970, sixty of Claude Lisle's 210 shares were cancelled. Twenty-two of the canceled shares were issued to and in the name of the pledge holder and 38 were reissued in Claude Lisle's name and held by the pledge holder.All shares were held by the escrow holder until March 26, 1974, when they were transferred to Lisle Funeral Home. The 188 shares, held in Claude Lisle's name by the escrow holder, were not endorsed by Claude Lisle. The books and records and the stock ledger of the funeral home reflect a redemption of Joel Lisle's 210 shares in November 1966 and Claude Lisle's 210 shares in November 1969. The corporate general ledger and accompanying journal entries maintained by Lisle Funeral Home reflect the purchase of Joel Lisle's stock as "Treasury shares" and the creation of a note payable to Joel Lisle.The entries reflect a "buy-out" of Claude Lisle's 210 shares as "Escrowed stock" and the creation of a note payable. Financial statements prepared to assist in securing *287 loans from financial institutions for the fiscal years ending March 31, 1966 through March 31, 1974, show the principal amounts owed to Joel and Claude Lisle as unsubordinated liabilities incurred in the redemption of the shares purchased from them. For its fiscal years ending March 31, 1969, March 31, 1970, and March 31, 1971, Lisle Funeral Home made payments to Joel and Claude Lisle with respect to the stock purchase obligations and characterized them as follows: PERIOD
INTEREST
PRINCIPAL
JOEL LISLE
4/1/68
to
3/31/69
$ 9,889.49
$ 3,946.31
4/1/69
to
3/31/70
10,369.43
4,231.81
4/1/70
to
3/31/71
10,541.82
4,537.71
CLAUDE LISLE
1/5/70
to
3/31/70
$ 5,085.93
$26,693.35
(includes
the $25,000
initial payment)
4/1/70
to
3/31/71
15,455.30
4,865.11
The Commissioner, in his statutory notice of deficiency to Lisle Funeral Home, disallowed interest deductions of $9,899, $15,724 and $24,607 for its taxable year ending March 31, 1969, March 31, 1970, and March 31, 1971, respectively, and determined that such amounts constituted the payment of dividends rather than payments of interest on indebtedness. In his statutory notice of deficiency to Joel Lisle and Claude Lisle, the Commissioner reduced their respective reported interest *288 income from the redemption and increased their dividend income by the amount of the interest and principal payments as follows: Total Payments
Total Payments Year
Joel Lisle
Claude Lisle
1968
$13,836.00
$ 0
1969
14,785.29
0
1970
15,458.00
30,200.00
Lisle Funeral Home had, since its organization, a practice of paying personal bills and making cash advances to its employees. It maintained accounts receivable accounts for the balances owed by the employees and no interest was charged. From time to time, the employees reimbursed the corporation for such advances. Throughout 1968, 1969 and 1970, balances were outstanding in such accounts receivable. It was not necessary for the corporation to borrow funds from outside sources in order to advance funds to its employees. In the respective notices of deficiency to Joel Lisle and Roy Franz, the Commissioner determined that the average balances outstanding each year represented interest-free use of corporate property which represented interest income to them as follows: Prevailing
Average Balance
Interest
Income
of Advances
Rate
Determined
Joel Lisle -- 1968
$7,049.07
8%
$563.93
1969
7,491.35
9%
674.22
1970
7,892.87
9%
710.36
Roy Franz -- 1968
$3,046.52
8%
$243.72
1969
4,143.03
9%
372.87
1970
8,376.75
9%
754.00
*289 Joel Lisle was neither a shareholder nor employee of Lisle Funeral Home during 1968, 1969 and 1970. Roy Franz was an employee of Lisle Funeral Home during 1968, 1969 and 1970 and during 1968 he owned an average of 14.63 percent of the outstanding shares of stock and during 1969 and 1970 he owned an average of 41.03 percent of such shares. During such years, there were an average of 11 shareholders. OPINION Respondent contends that the redemption agreements between Joel and Claude Lisle and Lisle Funeral Home did not transfer sufficient interest in their Lisle Funeral Home stock to qualify the transactions as redemptions. With respect to Joel Lisle, respondent maintains that he did not part with beneficial ownership in his 210 shares of stock. However, if we find that Joel Lisle's transfer constituted a redemption, respondent concedes that the redemption accomplished a complete termination of his shareholder interest within the meaning of section 302(b)(3), and that he should be entitled to exchange treatment under section 302(a). [3] *291 He also contends that Claude Lisle similarly retained beneficial ownership when he transferred 22 shares to Lisle Funeral Home in 1970. Consequently, *290 he maintains that all payments received by Claude Lisle pursuant to the redemption agreement constituted dividends. Sec. 302(d), I.R.C. 1954. Alternatively, he contends that Claude Lisle transferred and Lisle Funeral Home redeemed only 22 shares in 1970 with Claude Lisle retaining complete ownership in the remaining shares. He thereupon maintains that the payments to Claude Lisle in 1970 constituted an independent redemption to be examined without reference to subsequent transfers. Respondent contends, upon examining the 1970 redemption separately, that it was essentially equivalent to a dividend, United States v. Davis,397 U.S. 301 (1970). As a consequence of respondent's rejection of both Joel and Claude Lisle's transactions as redemptions, he has recharacterized the payments by Lisle Funeral Home to be dividend income rather than principal and interest payments. As a final issue for our consideration, respondent seeks review of our decision in J. Simpson Dean,35 T.C. 1083 (1961), where we held that an interest-free loan to shareholders does not generate constructive dividend income. Petitioners, on the other hand, contend that not only the form of the stock transfer arrangements constituted complete redemptions of both Joel and Claude Lisle's shareholder interests but that the substance of the agreements terminated all of their interest in Lisle Funeral Home except that of creditors. They maintain that redemptions which utilize installment payments have been accepted as a method of making payment within the meaning of section 302(b)(3). Estate of Oscar L. Mathis,47 T.C. 248 (1966); Perry S. Lewis,47 T.C. 129 (1966); Alfred N. Hoffman,47 T.C. 218 (1966), affd. per curiam 391 F.2d 930 (5th Cir. 1968). Initially, all parties agree that a sale for tax purposes, and consequently a redemption herein, occurs upon a passing of sufficient incidents of beneficial ownership rather than technical requirements for the passage of legal title under state law. See, e.g., Ray A. Maher,55 T.C. 441, 451-452 (1970), affd. in part and revd. in part, 469 F.2d 225 (8th Cir. 1972); Floyd R. Clodfelter,48 T.C. 694 (1967), affd. 426 F.2d 1391 (9th Cir. 1970); Ted F. Merrill,40 T.C. 66 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964). Section 317(b) provides that *292 "stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property * * *." It is also clear that section 302(b)(3) "contains no prohibition against payment of the redemption price on an installment basis." Estate of Oscar L. Mathis,supra, at 257. The question as to when a redemption is consumated for tax purposes is a practical one to be decided by weighing all of the various factors. Mathis,supra;Isidore Himmel,41 T.C. 62 (1963), revd. on other grounds 338 F.2d 815 (2d Cir. 1964); In re Lukens' Estate,246 F.2d 403 (3d Cir. 1957), revg. 26 T.C. 900 (1956). The factors to be considered are not unlike those examined when deciding whether the seller or the buyer of stock is subject to tax on dividends declared on pledged stock subject to a contract of sale; see Moore v. Commissioner,124 F.2d 997 (7th Cir. 1941); Estate of Arthur L. Hobson,17 T.C. 854 (1951), or whether the buyer or the seller is a shareholder for subchapter S purposes. Alfred N. Hoffman,supra.
Although the length of the installment payout period and the retention of voting rights by Joel and Claude Lisle, on their face, tend to lend support *293 to respondent's position, we find that, upon an examination of the following relevant criteria, a holding of a complete redemption of both shareholders' interests is warranted. 1. Firm and Fixed Plan
Whether the substance of the questioned transfers are redemptions, and particularly redemptions for purposes of section 302(b)(3), hinges initially upon a finding of something more than an amorphous arrangement; as explained in Otis P. Leleux,54 T.C. 408, 418 (1970), a firm and fixed plan to eliminate the shareholder interest must be present. * * * where redemptions have been executed pursuant to * * * a plan, it has been held that dividend equivalence may be avoided under the rationale that the individual redemptions constitute, in substance, the component parts of a single sale or exchange of the entire stock interest. In Re Lukens' Estate, 246 F.2d 403 (C.A. 3, 1957), reversing 26 T.C. 900 (1956); Jackson Howell, 26 T.C. 846 (1956), affd. 247 F.2d 156 (C.A. 9, 1957); Carter Tiffany, 16 T.C. 1443 (1951); Perry S. Lewis, 47 T.C. 129 (1966). However, for section 302(b)(3) to apply there must be a complete redemption of all the stock owned by a shareholder and we have refused to *294 treat a series of redemptions as a single sale unless the redemptions are pursuant to a firm and fixed plan to eliminate the stockholder from the corporation. Isidore Himmel, 41 T.C. 62 (1963), reversed on other grounds 338 F.2d 815 (C.A. 2, 1964). * * * [54 T.C. at 418] As we held in Leleux,supra, a gentleman's agreement lacking written embodiment, communication, and contractual obligations will generally not suffice. See also Bernard E. Niedermeyer,62 T.C. 280, 291 (1974); Harry F. Cornwall,48 T.C. 736, 748 (1967). In the instant case, the agreements and supporting documents are comprehensive and delineate the rights and obligations of the parties in the overall plan. The plan must be specific, firm and fixed and not subject to discretionary changes as we found in Isidore Himmel,supra.In Himmel at 74-75, the agreement did not require redemption but merely provided that the corporation may redeem if financially able and if its other shareholders so desired. There is no question concerning Joel Lisle's redemption agreement. The agreement clearly provided that Lisle Funeral Home "contracts to purchase * * * all of the stock owned by" Joel Lisle at the fixed price of $173,760. *295 The specifics of Claude Lisle's arrangement commenced in 1966 when Lisle Funeral Home obtained an option to purchase "all" of his stock. Claude Lisle's 1969 notice of intent to retire and sell his stock found Lisle Funeral Home with what it perceived to be insufficient earned surplus for the entire purchase to lawfully "take place" under California law. The terms in the corporate resolution questioned by respondent provide "that shares shall be deemed to have been purchased from Claude J. Lisle pursuant to this resolution only when, as and if payments * * * shall be sufficient to purchase shares." We do not believe the previously quoted language, when viewed in terms of the apprehension accorded depleting earned surplus beyond the legal limits of California law, presents a situation where the obligation assumed by Lisle Funeral Home can be characterized as conditional. Payment of any obligation is conditioned upon the legality of such payment; "[in] effect, the statute is read into the agreement." Mountain State Steel Foundries, Inc. v. Commissioner,284 F.2d 737, 742 (4th Cir. 1960), revg. a Memorandum Opinion of this Court. 2. Legal Title and Escrow Arrangements
Joel Lisle's *296 210 shares of stock were to be assigned to the pledge holder for purposes of security. The shares were in fact transferred to the pledge holder but were not endorsed. Of Claude Lisle's 210 shares, 22 were in the name of the pledge holder and 188 were in Claude Lisle's name and all were held by the pledge holder pursuant to the agreements. Whether shares of stock are transferred to the purchaser and assigned to the escrow holder, endorsed in blank by the seller and transferred to escrow holder or merely transferred to the escrow holder is immaterial when the purpose of the escrow, as here, is to provide security for deferred payments and the shares are in the possession of the pledge holder. Our statement in Floyd R. Clodfelter,48 T.C. 694, 700 (1967), affd. 426 F.2d 1391 (9th Cir. 1970), renders the use of naked title of little importance in deciding who is the equitable owner for tax purposes. The seller's retention of title under a conditional sale contract until all deferred payments have been received, does not prevent the sale from being a closed transaction in respect of which gain or loss is to be determined under the abovementioned statutory scheme. Such retention of *297 title is merely for security purposes; and the security thus provided for the seller is comparable to that which he would have acquired if he had first transferred the title to the purchaser and had then simultaneously reacquired the same for security purposes, through a mortgage from the purchaser. These two methods of providing security for deferred payments are treated alike for income tax purposes, since they have identical objectives and effects. J. W. McWilliams, 15 B.T.A. 329, 342-343; and United States v. Marshall, 357 F.2d 294, 295 (C.A. 9, 1966). * * * See also Ray A. Maher,55 T.C. 441, 452 (1970). 3. Intent of the Parties
The intent of the parties as to when the benefits and burdens of ownership are transferred assists in deciding the substance of a sale arrangement. See, e.g., Ted F. Merrill,40 T.C. 66, 74 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964); Estate of Oscar L. Mathis,47 T.C. 248, 257 (1966); Perry S. Lewis,47 T.C. 129, 133 (1966). An examination of the record convinces us that Roy Franz and Robert Lisle clearly desired complete ownership and management of Lisle Funeral Home and intended to redeem Joel Lisle's and Claude Lisle's shareholder interests *298 completely. The testimony, provisions in the agreements, board of directors minutes, and conduct of the parties all confirm an intended complete redemption. Cf. Percy A. Reitz,61 T.C. 443, 448 (1974). 4. Participation in Future Profits
The selling prices of Joel and Claude Lisle's stock was based initially upon the purchase price reached by L. M. Horg and Lucian L. Minor when Mr. Minor proposed to purchase the shares outright. The per share value agreed to by Joel Lisle was substantially the same as determined by Mr. Horg in August of 1966. Claude Lisle's 1966 agreement fixed the terms for computing the sales price of his shares when Lisle Funeral Home exercised its option to purchase his stock. The selling price of Claude Lisle's shares was based on Mr. Horg's figures and increased proportionately for subsequent profits until the effective date of the exercise. Both Joel and Claude Lisle received a $25,000 down payment in their respective years of sale. A fixed or determinable selling price and a significant down payment are objective factors indicating the existence of a sale. Floyd R. Clodfelter,supra;Sam E. Wilson, Jr., 27 T.C. 976, 983 (1957), affd. per curiam 255 F.2d 702 (5th Cir. 1958); *299 W. H. Hay,25 B.T.A. 96, 101 (1932). Neither Joel nor Claude Lisle retained the right to share in corporate profits either by appreciation or dividends after the effective dates of their sales. See Alfred N. Hoffman,47 T.C. 218, 232-233 (1966). The fact that dividends, if declared, would have been paid to Joel and Claude Lisle as record owners is not controlling in deciding whether the transactions are, in substance, sales. More importantly, the right to receive dividends did not enrich Joel or Claude Lisle because they were required to credit any dividends paid against the purchase prices for their stock. Compare Miller v. Commissioner,247 F.2d 206 (7th Cir. 1957), cert. denied 355 U.S. 939 (1958) with Merrill C. Gilmore,25 T.C. 1321 (1956). As we pointed out in Estate of Arthur L. Hobson,17 T.C. 854, 858, 861 (1951), it would indeed be unusually gratuitous for the owner of stock to apply dividend income therefrom to an obligation owed by another individual. 5. Retention of Voting Rights
Generally, the right to vote common stock is a benefit accompanying its ownership and the failure to convey such a right is an important factor in determining whether a sale has occurred. *300 See Kuehner v. Commissioner,214 F.2d 437 (1st Cir. 1954), affg. 20 T.C. 875 (1953). Moreover, the presence of voting rights without further examination may "strongly indicate" the existence of an equity interest. Jordan Co. v. Allen,85 F. Supp. 437, 443 (M.D. Ga. 1949). However, the opportunity for effective exercise and the ability to affect decision making bears more on the question of beneficial ownership than the mere right to vote. See Ray A. Maher,55 T.C. 441, 451 (1970), affd. in part and revd. in part 469 F.2d 225 (8th Cir. 1972). The voting rights retained by Joel and Claude Lisle served as additional security for the payment of the purchase price in a fashion similar to the voting rights attached to the bonds received by the sellers of stock in the Estate of Ernest G. Howes,30 T.C. 909, 924 (1958), affd. sub nom Commissioner v. Johnson,267 F.2d 382, 384 (1st Cir. 1959). The record clearly establishes that Claude Lisle's managerial capabilities have been questioned as far back as when John Lisle, the father, managed the funeral business. Both Joel Lisle and the prospective owner-managers, Roy Franz and Robert Lisle, feared that without the retention of Joel Lisle's *301 voting rights there would be no means available to counter any influence which Claude Lisle might exert over the management of Lisle Funeral Home. Although the retention of such rights by Claude Lisle and Joel Lisle's continued retention of rights after Claude Lisle's redemption in 1970 casts some doubt upon our conclusion, we, nevertheless, hold that the retention of voting rights in view of the facts is not inconsistent with our finding of a complete redemption of both Joel and Claude Lisle's stockholder interests. Cf. Perry S. Lewis,47 T.C. 129, 131 (1966). 6.Participation in Management
Continued participation in the management of corporate affairs clearly indicates retention of a stockholder interest. Perry S. Lewis,supra at 134-135; Beatrice Levin,47 T.C. 258, 264 (1966), affd. 385 F.2d 521 (2d Cir. 1967); Otis P. Leleux,supra at 419. Joel Lisle was vice president of Lisle Funeral Home from August 13, 1962 to March 27, 1974. He was also a director through March 26, 1974. Claude Lisle was president of Lisle Funeral Home from August 13, 1962 to June 26, 1970, and thereafter chairman of the board of directors until June 27, 1974. Both Joel and Claude Lisle attended substantially *302 every board of directors meeting from February 13, 1967 through March 27, 1974, and voted on matters before the board. Respondent contends that the retention by Joel and Claude Lisle of their officer positions and membership on the board of directors indicates that they have not terminated their interests in the corporation. Retention of such status brings about the operation of the rules of constructive ownership. Sec. 302 (c)(2)(A) (i); Sec. 318(a). The purpose of such provision is, however, to determine if stock not actually owned by the shareholder whose stock is redeemed is, nevertheless, treated as the owner of other stock. Constructive ownership of stock is not involved in this case and section 302(c)(2)(A)(i) has no bearing on the redemption in question. tSee the concurring opinion of Judge Simpson in Perry S. Lewis,supra at 137. We agree with such opinion that "Congress did not intend us to hold that an officer or director who performs no duties, receives no compensation, and exercises no influence has retained an interest in the corporation." An intensive examination of the extensive testimony of the witnesses convinces us that Joel and Claude Lisle were officers and *303 directors in name only. Joel Lisle sought elimination from ownership and management due to a strong desire to retire from the business occasioned by the emotional burdens he bore by the recurring deaths and funeral services for his friends. There is no evidence that Joel Lisle actively participated in management which was generally physically impossible due to the change of his residence from Fresno to Corona Del Mar, 270 miles distant, prior to the redemption of his stock in 1966. On the other hand, Claude Lisle attempted to assert a voice in management on various occasions before his retirement but Roy Franz and Robert Lisle had assumed complete management upon Joel Lisle's departure and Claude Lisle's interference ceased. Neither Joel nor Claude Lisle exerted any appreciable influence upon the corporate affairs after the redemptions of their stock. 7. Provision for Default
Respondent contends that Joel Lisle could, "in his unqualified discretion," sell his stock at public or private sale. We assume that respondent's concern centers upon the potential for reacquisition of the stock upon default. See Rev. Proc. 72-9, 1972-1 C.B. 718, 719. As set forth in Treas. Regs. section *304 1.302-4(e), such concern may be warranted when waiver of the attribution rules is sought; however, as we have pointed out previously in Alfred N. Hoffman,supra at 232, footnote 6, if the seller is regarded as owner of stock upon default, then support is found for a sale from the parties regarding the buyer as owner until such a default. See also Floyd R. Clodfelter,48 T.C. 694, 701 (1967), affd. 426 F.2d 1391 (9th Cir. 1970). Respondent does not direct our attention to any specific provision or agreement to support his position that Joel or Claude Lisle had an unqualified right of sale. However, both of the security agreements at paragraph 6(c) contain the following language: (c) Upon Debtors' default or if Secured Party deems the collateral to be insufficient by reason of the decline in the market value of any of the collateral, (1) Secured Party shall have at any time thereafter the rights and remedies provided in the Uniform Commercial Code in force in the State of California at the date of execution of this security agreement. (2) In addition to, substitution for, modification of or conjunction with those rights and remedies, Secured Party may: (A) In his discretion, sell, *305 assign, and deliver all or any part of the collateral at any public or private sale without notice of advertisement; provided, however, that Debtors shall be given written notice five days prior to the date after which private sale of the collateral will be made by mailing such notice to Debtors at the address designated with their signatures below. (B) Bid and become purchaser at any public sale. (C) Apply the proceeds of the disposition of collateral available for satisfaction of Debtors' indebtedness in any order of preference which Secured Party in his sole discretion chooses. The right to sell clearly reflects concern over default and the adequacy of the security; however, the right to sell does not detract from the substance of the sale. The right to sell was not unqualified because "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." California Lettuce Growers v. Union Sugar Co.,45 Cal. 474, 484, 289 P.2d 785 (1955). See also Estate of Arthur L. Hobson,17 T.C. 854, 858 (1951). 8. Length of Installment Payout Period
Although on brief *306 respondent concedes that the installment notes do not represent an equity interest, he contends that the length of the payout period coupled with the voting rights weighs heavily against a sale in each instance. See Rev. Proc. 72-9, 1972-1 C.B. 718, 720. In light of respondent's concession, we understand his concern to be directed at the transfer side of the transaction; i.e., no redemption, and not that the obligations received represent some form of equity interest. See Mary Duerr,30 T.C. 944 (1958). Installment redemptions of shorter duration which cover more than one taxable period have been before this Court on prior occasions. Estate of Oscar L. Mathis,47 T.C. 248 (1966) (13 months); Perry S. Lewis,47 T.C. 129 (1966) (8-year payout accelerated to 5 years); Ray A. Maher,55 T.C. 441 (1970) (10 years or less paid in 8 years). Respondent does recognize that a "redemption" can occur using promissory notes payable in ten annual installments. Rev. Rul. 57-295, 1957-2 C.B. 227. The evil, however, is clear: redemptions which employ long-term payouts should be suspect because deductibility of interest payments provide the corporation with an attractive method of implementing a *307 substitute plan for nondeductible dividend payments. We have not been directed to any authority where a redemption has been denied based on the length of time for paying installment obligations. However, there are instances where long-term obligations issued pursuant to a sale have been upheld as debt. Mountain State Steel Foundries, Inc. v. Commissioner,284 F.2d 737 (4th Cir. 1960), revg. a Memorandum Opinion of this Court (27 and 44-year redemption notes); Monon Railroad,55 T.C. 345 (1970) (50-year income debentures issued in exchange for stock); Commissioner v. H. P. Hood & Sons,141 F.2d 467 (1st Cir. 1944) (40-year income debentures issued in exchange for stock). We have no evidence, other than the lack of dividend history, to suggest that the redemptions herein were motivated as a tax avoidance device to obtain deductible interest in lieu of nondeductible dividend payments. Since respondent has limited his challenge to the circumstances surrounding the transfers and has conceded that the notes represented debt, a further examination of the equity aspect of the notes is not warranted. The length of the payout period, of itself, in the peculiar facts of this case, does *308 not cause the redemption to fail. That is not to say that a payout of 20 years, together with other factors not present here, might indicate that the arrangement did not constitute a complete termination of a shareholder's interest in the corporation. 9. Continued Access to Corporate Benefits
As we stated in Beatrice Levin,supra at 264, when deciding dividend equivalency "mere legal control through stock ownership appears less important tnan control in the sense of [the] ability to maintain access to corporate benefits." The ability to maintain an access to corporate benefits would likewise be contrary to a finding that there has been a complete termination of a shareholder's interest. Respondent sets forth Joel Lisle's interestfree loans, Lisle Funeral Home's guarantee of a bank loan for Joel Lisle, the availability of lodging and the continued membership in the country club all as indicating retention of access to corporate benefits. The latter two items, lodging and club membership, are clearly items bargained for in the redemption agreement and do not support an ability in Joel Lisle to direct benefits to himself subsequent to the redemption. The interest-free loans stemmed *309 from a policy in effect prior to the redemption of Joel Lisle's stock. The only evidence we have concerning the bills paid which underlie the account receivable indicates that they were either incurred before the redemption or, if after the redemption, that they generally were incurred as an incident to the country club membership previously discussed. We do not consider Lisle Funeral Home's guarantee of the loan obtained by Joel Lisle to be unusual. To accomodate his creditor, Joel could have just as easily assigned his rights under the redemption agreement. Furthermore, there is evidence that Joel attempted to obtain prepayment of his installment obligation for 7 months at a board of directors meeting. Such request was denied by the board and clearly indicates an inability rather than an ability to influence corporate benefits. We find that upon due consideration of the factors set forth above and the record as a whole that Joel Lisle and Claude Lisle effectuated complete redemptions of their shareholder interests in Lisle Funeral Home within the meaning of section 302(b)(3) during the taxable years 1966 and 1969, respectively. As a consequence, Petitioner Lisle Funeral Home *310 is entitled to deduct the interest payments on the installment notes. The final issue to be resolved is whether Joel Lisle and Roy Franz should be taxed for the interest-free use of corporate funds. Since its organization, Lisle Funeral Home paid personal bills of some of its employees and also made cash advances to them, all of which it recorded on its books as accounts receivable. It did not charge the employees interest on the unpaid balances and from time to time the employees reimbursed the corporation for such advances. The Commissioner, in his statutory notice of deficiency, applied an annual prevailing interest rate to the average outstanding balances of the accounts receivable of Joel Lisle and Roy Franz for each of the taxable years 1968, 1969 and 1970 and charged them with dividend income for the amounts so determined. Respondent did not make his determination under the discretion granted to him under section 482 or Treas. Regs. section 1.482-2. The parties argue the merits of J. Simpson Dean,35 T.C. 1083 (1961), petitioner pointing out that we held in favor of the taxpayers and respondent requesting us to re-examine our decision in that case.Dean was Court-reviewed *311 and the government filed an appeal which it later dismissed. No court has held contrary to our holding in Dean. The instant case is not the proper vehicle for a review of our holding in Dean because it is factually distinguishable. The two taxpayers in Dean, husband and wife, together with trusts created by them, owned all of the issued and outstanding stock of the corporation from which they borrowed funds. There was no finding in that case that either of the taxpayers was an employee of the corporation. The corporation had been a personal holding company for over 20 years. The indebtedness was evidenced by promissory notes which bore no interest and the balances owed by Mr. Dean were from $223,861.56 to $357,293.41 and the balances owed by Mrs. Dean were from $1,832,764.71 to $2,205,804.66. In the instant case, on the other hand, Joel Lisle was neither an employee of the corporation and we have held above that he was not a shareholder of the corporation after his stock was redeemed in 1966. Dean obviously could have no application to him. Roy Franz was an employee but his ownership of stock during 1968 to 1970 was small; i.e., 14.63 percent in 1968 and 41.03 percent in 1969 *312 and 1970. There were an average of 11 shareholders during those years. The amounts advanced to him during the years the Commissioner charged him with income range from $3,046.52 to $8,376.75. Clearly, Roy Franz had little control over the corporation and the practice of advancing funds to employees existed long before he became an employee. Such factual differences between the instant case and those of Dean are so substantial that a review of Dean is not warranted. Respondent cites no authority nor does he urge us outside a review of Dean, to hold that the incidental benefit accruing to Roy Franz should be taxable and we have found no such authority. Accordingly, we decide the issue against the respondent. Decision will be entered for petitioner in docket No. 1849-73.
Decisions will be entered under Rule 155 in docket Nos. 1760-73, 1851-73 and 1852-73.* Footnotes
1. Cases of the following petitioners are consolidated herewith: Joel R. Lisle and Helen Lisle, docket No. 1849-73; Lisle Funeral Home, docket No. 1851-73; Roy A. Franz and Esther Franz, docket No. 1852-73.↩
*. The deficiencies as determined by the Commissioner are for the taxable years ended March 31.↩
2. All Code section references are to the Internal Revenue Code of 1954, as amended.↩
3. Respondent does not challenge either Joel or Claude Lisle's deferred method of reporting the gain.